UNITED STATES of America, Appellee,

v.

**Edwin A. PAGAN, Appellant.**

**No. 1432, Docket 83–1061.**

United States Court of Appeals,
Second Circuit.

Argued June 14, 1983.
Decided Oct. 18, 1983.

Richard A. Reeve, Asst. Federal Public Defender, New Haven, Conn. (Thomas G. Dennis, Federal Public Defender, D. Connecticut, of counsel), for appellant.

Kurt F. Zimmermann, Asst. U.S. Atty., New Haven, Conn. (Alan H. Nevas, U.S. Atty., D. Connecticut, New Haven, Conn., of counsel), for appellee.

Before FRIENDLY, KEARSE and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

The principal issue presented on this appeal is appellant Edwin Pagan's claim that his earlier Youth Corrections Act (YCA) conviction was improperly admitted into evidence at his trial. To resolve that question, we must determine whether a court's unconditional discharge of appellant prior

to the expiration of the maximum sentence imposed and the resulting set-aside of that conviction constitute a finding that he had been rehabilitated and, if so, whether such a finding should have barred admission of the YCA conviction at appellant's trial.

### FACTS

In the summer of 1981 the Drug Enforcement Administration (DEA) employed Jose Rosario, an undercover informant, to establish himself unobtrusively in the Borinquen Cafe, a suspected meeting place for drug dealers, in Stamford, Connecticut. While frequenting the Cafe, Rosario became acquainted with appellant Pagan and later arranged for a "relative", actually DEA Agent Barry Abbott, to purchase heroin from Pagan. The sale occurred on June 18, 1981 when Pagan delivered approximately one ounce of heroin to Abbott. While the agreed purchase price was $3,000, Pagan was paid only $1,500 at the time; the agent promised the balance soon. Appellant later expressed concern about collecting the $1,500 balance from Abbott and his worry that Abbott might be a cop. Perhaps because of these reservations—or maybe despite them—Pagan elected to send a friend, Jesus Riviera, to collect the balance due on the first sale and to sell additional heroin. On July 17 Riviera met with DEA Special Agent Robert Breard and sold him one-half ounce of heroin. The agent, who was equipped with a transmitting device, recorded the conversation during the sale. The discussion concerned payment for the one-half ounce then sold and the $1,500 balance due Pagan from the June 18th sale. Riviera and Breard also discussed the availability and terms for the sale of higher quality heroin. During the course of this conversation, it was implicit that Pagan was the source of Riviera's supply. Riviera did not testify at appellant's trial, but the tape of this conversation was admitted into evidence against appellant.

Pagan and Riviera were subsequently arrested and charged in a five count indictment with violating several provisions of the Controlled Substances Act. 21 U.S.C. §§ 841, 846 (1976). Specifically, in Count One they were charged with conspiring to possess with intent to distribute, and conspiring to distribute, heroin in violation of 21 U.S.C. §§ 846 and 841(a)(1). Counts Two and Three charged Pagan with the substantive offenses of distributing heroin on two instances on June 18, 1981 in violation of 21 U.S.C. § 841(a)(1). Counts Four and Five charged Riviera with two illegal distributions of heroin on July 17, 1981.

Prior to the commencement of a jury trial in the United States District Court for the District of Connecticut, before Judge Ellen B. Burns, Riviera pled guilty to Count One. The charges set forth in Counts Four and Five were then stricken and the prosecution proceeded solely against appellant. At trial Pagan relied upon the defense of entrapment. He took the stand and testified that Rosario had instigated both drug transactions and had coerced him into participating by asking him to act as a courier. Prior to the close of the evidence, Count Three (a charge of passing a sample on June 18) was dismissed or consolidated with Count Two, the sale count charged on the same date. The jury convicted appellant on all counts submitted to it. Following the denial of post-trial motions for dismissal and acquittal, appellant was sentenced on January 28, 1983 to one year in prison on Count One and to a like term on Count Two, together with a special term of parole for three years. These concurrent sentences are presently being served. From the denial of his post-trial motions and the judgment of conviction, Pagan has appealed.

### II

■ Since two of the four issues raised, which were the subject of appellant's post-trial motions, seek a dismissal of the indictment, we discuss them at the outset. The first is a claim of outrageous government conduct. Appellant asserts three factors in support of this contention: police over-involvement in the creation of the offense, payments to the informant, Rosario, on a contingency basis, and lack of sufficient

supervision of the informant immediately prior to the June 18th sale. Appellant relies principally on the rationale of the trial court in *United States v. Brown,* 462 F.Supp. 184 (S.D.N.Y.1978), *rev'd,* 602 F.2d 1073 (2d Cir.1979), which dismissed an indictment upon a finding of outrageous government conduct under arguably similar circumstances.

Appellant's claim of police over-involvement is less than persuasive; not only because this Court reversed and reinstated the indictment in *Brown,* but also because the three allegedly supporting factors fade upon analysis. The claim of police over-involvement simply rehashes the entrapment defense presented at trial. For example, appellant argues that government informant Rosario induced him into a one-time sale instigated by DEA agents. Of course, this is appellant's version of the events and is the same scenario he used at trial to support the entrapment defense. According to the record, the prosecution introduced evidence that Pagan offered to sell Rosario heroin. Rosario further testified that when he was present at the Borinquen Cafe prior to the June 18 sale, he observed Pagan conducting a drug deal and cutting heroin with other dealers. In this credibility match-up between appellant and the informant, the jury accepted Rosario's version of the events leading to the sale by finding Pagan guilty. More importantly, for the purposes of this appeal, we must view the evidence in a light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

The contingency fee payment, apparently a not uncommon form of remuneration, *see e.g., United States v. Brown,* 602 F.2d at 1075 ($500 paid to an informant for his role in the transactions leading to Brown's arrest), has not been held, in and of itself, to require dismissal of an indictment on a theory of outrageous government conduct. Similarly, the lack of supervision of the informant fails to provide sufficient grounds for reversal. The supervision of Rosario was concededly less than fool-proof, particularly in the search conducted by the DEA agents (they did not search his car)

immediately prior to Rosario's departure to meet Pagan and escort him to the site of the June 18 sale. It is also obvious, however, that an absolute search for one ounce of heroin is not always practical; moreover, Agent Breard testified that he had worked with this informant for six years and found him trustworthy. In denying the post-trial motion Judge Burns noted that Rosario had been subjected during the trial to an extensive and wide-ranging cross examination. Thus, the trial court's denial of the motion to dismiss on the grounds of outrageous government conduct was an appropriate exercise of its discretion. *See United States v. Williams,* 705 F.2d 603 (2d Cir.1983); *United States v. Myers,* 692 F.2d 823 (2d Cir.1982) *(Myers II ), cert. denied,* —— U.S. ——, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983); *United States v. Myers,* 635 F.2d 932 (2d Cir.) *(Myers I ), cert. denied,* 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980).

Appellant's other motion, which sought dismissal of the indictment on the grounds of ambiguity, deserves little comment. The indictment upon which Pagan was tried charged that he and Riviera did combine, conspire and confederate with "diverse other persons whose names are to the Grand Jury unknown" to distribute heroin. Since there was no evidence of "other persons" involved, the trial court responded to Pagan's claim of ambiguity by eliminating the quoted words and simply charging that Pagan and Riviera "willfully and knowingly did combine, conspire and confederate to possess with intent to distribute, and to distribute heroin." Inasmuch as the indictment informed appellant of the nature of the charge against him, did not subject him to being put twice in jeopardy and gave him sufficient notice of "the core of criminality" to be proven against him, *United States v. Sindona,* 636 F.2d 792, 797–98 (2d Cir.1980), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981), it was valid. *See United States v. Silverman,* 430 F.2d 106 (2d Cir.1970), *cert. denied,* 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971). A certain amount of variance between the

charge in an indictment and proof at trial is permitted, *United States v. Heimann,* 705 F.2d 662 (2d Cir.1983), so long as this difference does not deprive a defendant of one of these significant protections afforded by a grand jury indictment. There is no such deprivation in this case. The objected to language contained in the indictment and eliminated from the charge amounted to no more than non-essential surplusage, and resulted in no prejudice to appellant.

## III

The principal issue on appeal is whether the district court committed reversible error in admitting for the purpose of impeachment evidence that Pagan had previously been convicted under the Youth Corrections Act. 18 U.S.C. §§ 5005 *et seq.* (1976). On June 12, 1975, Pagan, then 19 years old, had pled guilty to two counts of a seven count indictment which charged him with interstate transportation of a stolen vehicle under 18 U.S.C. §§ 371 & 2313 (1976). Appellant's two year sentence of probation had been vacated prior to its expiration on May 11, 1977, pursuant to 18 U.S.C. § 5021(b) (1976), the set-aside provision of the Youth Corrections Act. In order to decide the propriety of admitting the Youth Corrections Act conviction, it must first be determined whether the set-aside of that conviction constituted a finding that Pagan was rehabilitated. The significance of a finding of rehabilitation is that under Federal Rule of Evidence 609(c)(1) evidence of a conviction is *not* admissible if "the conviction has been the subject of a ... certificate of rehabilitation, or other equivalent procedure based on a finding of the rehabilitation of the person convicted." Pagan's earlier conviction was not the subject of a certificate of rehabilitation, but the circumstances surrounding his sentence of probation and that sentence's later vacation may well constitute an "other equivalent procedure" under Rule 609(c)(1) so as to bar the use of his former conviction at the instant trial. We begin our analysis of this possibility by looking first to the genesis of the Youth Corrections Act.

In October 1949 extensive hearings were held before a subcommittee of the Senate Committee on the Judiciary on S. 2609, which became in 1950, substantially, the Youth Corrections Act (YCA). The YCA derived from an English penological experiment at Borstal Prison in the late 1890's which revealed that separating youth offenders from older, and presumably more hardened, criminals and providing them with specialized care and supervision dramatically reduced the rate of recidivism of those treated. Inspired by this example, Congress set out "to provide a system for the treatment and rehabilitation of youth offenders." *See Hearings on S. 1114 & S. 2609 Before the Subcommittee of the Committee on the Judiciary,* 81st Cong., 1st Sess. 1, 62–65 (1949). The House Report states that the purpose of the Act was to provide a system of sentencing that "will promote rehabilitation of those who in the opinion of the sentencing judge show promise of becoming useful citizens." H.R.Rep. No. 2979, 81st Cong., 2d Sess. 1, *reprinted in* 1950 U.S.Code Cong.Serv. 3983, 3983. The House Report further declares that the Act "is designed to provide methods and means that will effect ... rehabilitation" and that it "departs from the mere punitive idea of dealing with criminals and looks primarily to the objective idea of rehabilitation." *Id.* at 3, *reprinted in* 1950 U.S.Code Cong.Serv. at 3985. We next examine certain of the Act's provisions in light of Congress' avowed purpose.

Under the Act, the trial judge has discretion to sentence persons under the age of 22 to (1) probation, 18 U.S.C. § 5010(a), (2) "special treatment" under the supervision of the Attorney General as provided for in the Act, 18 U.S.C. § 5010(b) and (c) or (3) regular adult sentencing, 18 U.S.C. § 5010(d). From the time of its enactment, the Act provided that when an offender who was sentenced to special treatment under § 5010(b) or (c) obtained an unconditional discharge by the Youth Correction Division of the Board of Parole before the expiration of the maximum term sentence imposed, his conviction was automatically set aside and the sentenced youth was enti-

tled to receive a certificate to that effect. 18 U.S.C. § 5021. Successfully completing a sentence under the Act did not entitle the offender to the benefit of the set aside. Only those who have been unconditionally discharged *prior* to the expiration of their sentences obtain the set-aside. Recently, the Supreme Court construed the YCA and stated that: "Congress' purpose in adopting § 5021 was to promote the rehabilitation of youth offenders by providing a substantial incentive for positive behavior while serving a sentence under the YCA." *Tuten v. United States,* —— U.S. ——, 103 S.Ct. 1412, 1415, 75 L.Ed.2d 359 (1983) (citing Hearings, *supra,* at 14).

The views of the Department of Justice in its analysis of the Act indicate that the unconditional discharge prior to the expiration of the maximum term and the set aside of the conviction were to occur "[i]f [the youth offender] has responded to treatment and the Youth Division is of the opinion that his rehabilitation has been accomplished." H.R.Rep. No. 2979, *reprinted in* 1950 U.S.Code Cong.Serv. at 3992. In 1961, the Act was amended to make the automatic set-aside provision equally available to youthful offenders sentenced to probation. This served to correct an inconsistency under which only those youthful offenders committed to the custody of the Attorney General obtained the valuable benefit of having their convictions set aside and a certificate issued to that effect. Pub.L. No. 87–336, 75 Stat. 750 (codified at 18 U.S.C. § 5021(b) (1976)). *See* S.Rep. No. 1048, 87th Cong., 1st Sess. 1, *reprinted in* 1961 U.S.Code Cong. & Ad.News 3050, 3050. Presently, the only difference between § 5021(a) and § 5021(b) is that the latter, instead of vesting discretion in the Youth Correction Division, requires a court to decide whether the offender sentenced to probation should be given an unconditional discharge *prior* to the expiration of his term and have his conviction set aside. The same standards guide both the Youth Correction Division and the court. The court may grant an early unconditional discharge only when, in its view, the offender's rehabilitation has been accomplished. Implicit therefore in the court's exercise of its discretion to grant an early discharge is a finding on its part that the offender has in some way reached the rehabilitative goal the Act was designed to accomplish. In that way, an *early* discharge reinforces those ideals Congress had in mind—providing an incentive for positive behavior and discouraging recidivism. *See Dorszynski v. United States,* 418 U.S. 424, 433, 94 S.Ct. 3042, 3048, 41 L.Ed.2d 855 (1974).

■ We turn now to analyze what practical effect the set-aside and supposed clearing of a youth offender's record has when he later, as here, is the subject of a criminal prosecution. Fed.R.Evid. 609(c)(1), as noted, provides that evidence of a conviction is not admissible where the conviction has been the subject of an "other equivalent procedure based on a finding of the rehabilitation of the person convicted." Thus, despite the absence of a certificate of rehabilitation or a finding of rehabilitation in so many words by a court, an "equivalent procedure" may be found to be present. The government asserts—and we agree—that Rule 609(c) is designed to regulate the truth-finding process of a trial. The government urges that, in our consideration of the set-aside provisions of § 5021(b) as it relates to the truth-finding process regulated by Rule 609(c), we place primary attention on the scope of the Rule. The Notes of the Advisory Committee on the Proposed Rules of Evidence make clear that pardons or their equivalent granted solely to restore civil rights lost by a conviction are not relevant to an inquiry into character. "If, however, . . . the proceeding is hinged upon a showing of rehabilitation the situation is otherwise. The result under the rule is to render the conviction inadmissible." Fed.R. Evid. 609(c) advisory committee note. We are persuaded that the scope of Rule 609(c)(1) includes a proceeding under § 5021(b) in which the court in its discretion grants an early discharge upon a finding of rehabilitation that results in the set-aside of a conviction. Such a conviction, therefore, may not be introduced into evi-

dence upon the subsequent trial of the same offender.

The cases from other circuits cited and relied upon by the government are not irreconcilable with this conclusion since gen-. erally they deal with an interpretation of state corrections law. *See United States v. Moore,* 556 F.2d 479 (10th Cir.1977) (California law specifically provided that expunged conviction could be used in a subsequent criminal proceeding involving the same party); *United States v. Potts,* 528 F.2d 883 (9th Cir.1975) (en banc) (under Washington law, expungement provisions provided only for the restoration of an offender's civil rights); *United States v. Jones,* 647 F.2d 696, 700 (6th Cir.) (under Kentucky law, pardon restored only civil rights), *cert. denied* 454 U.S. 898, 102 S.Ct. 399, 70 L.Ed.2d 214 (1981). Other cases cited by the government are factually distinguishable. *United States v. Hall,* 588 F.2d 613 (8th Cir.1978) (argument to bar prior conviction was based upon fact that offender received a suspended sentence); *United States v. Wiggins,* 566 F.2d 944 (5th Cir.1978) (bar from use of sentence of probation argued on the basis that offender had been released from a halfway house), *cert. denied,* 436 U.S. 950, 98 S.Ct. 2859, 56 L.Ed.2d 793 (1978).

We think that a certificate setting aside a youthful offender's conviction and unconditionally discharging him from further probation prior to expiration of the maximum term of probation clearly implies a finding that no further supervision is required, i.e., that this offender has been rehabilitated. *See* 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 609[08] at 609–97 (1982). Accordingly, we hold that a finding of rehabilitation or its "equivalent procedure" was present in this case where a court twice exercised its discretion before a § 5021(b) set-aside occurred. First, the court placed the appellant, as a youthful offender, on probation rather than sentencing him to "special treatment" under the Attorney General or confining him under regular adult sentencing provisions and, second, the court later granted him an unconditional discharge *prior* to his probation's expiration.

Where a court exercises its discretion in this fashion, we think it fairly can be described as an "other equivalent procedure" under Rule 609(c)(1), thus barring admission of the conviction for impeachment purposes. *See United States v. Trejo-Zambrano,* 582 F.2d 460, 464 (9th Cir.), *cert. denied,* 439 U.S. 1005, 99 S.Ct. 618, 58 L.Ed.2d 682 (1978).

We still must consider whether the error of admitting Pagan's prior conviction requires a new trial. The government argues that its case against Pagan was so overwhelming that the admission of the evidence of a prior conviction was harmless. Our review of the record indicates to the contrary, that the prosecution's case was less than overwhelming, particularly on the issue of entrapment where it was simply Pagan's word against Rosario's. The government further claims that even though we find the trial court's ruling to be in error, it was harmless because the prior conviction evidence was admissible in any event to disprove the defense of entrapment. This contention is unpersuasive for two reasons. First, the jury was instructed that it could only consider the prior conviction in passing upon Pagan's credibility. The jury was not instructed that the conviction might be relevant to the issue of predisposition. Thus, the adverse impact on Pagan's credibility brought about by the introduction of the prior conviction was not mitigated simply because this proof might have been introduced against him on some other issue. *Cf. United States v. Kaplan,* 510 F.2d 606, 612–13 (2d Cir.1974) (on petition for rehearing) (error in admitting evidence not excused where alternative ground for admission might have existed since admission pursuant to that alternative ground would have been for a different purpose).

■ Second, we do not believe that the prior conviction would have been admissible even under the alternative rationale now suggested. It is true, as the government asserts, that once a defendant raises the defense of entrapment, evidence of prior convictions *relevant* to the issue of predis-

position may be introduced by the government in rebuttal. *See, e.g., United States v. Apuzzo,* 555 F.2d 306, 307 (2d Cir.1977), *cert. denied,* 435 U.S. 916, 98 S.Ct. 1470, 55 L.Ed.2d 507 (1978); *United States v. Dickens,* 524 F.2d 441, 445 (5th Cir.1975), *cert. denied,* 425 U.S. 994, 96 S.Ct. 2208, 48 L.Ed.2d 819 (1976); 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 404[04], at 404–28 (1982). But, evidence of such prior crimes must involve offenses similar to those in question in order to constitute relevant rebuttal evidence. *See Appuzzo,* 555 F.2d at 307; *United States v. Viviano,* 437 F.2d 295, 299 n. 3 (2d Cir.), *cert. denied,* 402 U.S. 983, 91 S.Ct. 1659, 29 L.Ed.2d 149 (1971); *DeJong v. United States,* 381 F.2d 725, 726 (9th Cir.1967). Here the prior conviction for dealing in stolen automobiles is so dissimilar from heroin trafficking that it would not have been relevant to demonstrate Pagan's predisposition to distribute drugs. Hence, the evidence of the prior conviction was not admissible to rebut the defense of entrapment.

The general rule here applicable is that the erroneous admission of a defendant's prior conviction ordinarily warrants a new trial. *See United States v. Figueroa,* 618 F.2d 934, 944 (2d Cir.1980). There is no basis for escaping that conclusion in this case. Appellant's credibility was critical. His defense was entrapment and his sworn version of the facts leading up to the heroin transactions differed significantly from that of the government's chief witness, Jose Rosario. Defendant claimed that Rosario himself supplied the heroin and induced him to become involved, and that without Rosario's pressure and actions he never would have participated. He further testified that he never told Rosario that Jesus Riviera would later deal in heroin for him, and that he had no agreement of any kind with Riviera. The resolution of the credibility of these two witnesses and their radically different testimony was the central task of the jury. *United States v. Taylor,* 464 F.2d 240, 243 (2d Cir.1973). We cannot believe that under these circumstances the introduction of Pagan's prior conviction " 'did not influence the jury or had but very slight ef-

fect.' " *United States v. Ruffin,* 575 F.2d 346, 359 (2d Cir.1978) (quoting *Kotteakos v. United States,* 328 U.S. 750, 764, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)). It therefore cannot be characterized as "harmless" error.

## IV

As a final issue appellant asserts that the admission at trial of the co-conspirator Riviera's taped statement violated his Sixth Amendment right to confront the witnesses against him because the government failed to prove that Riviera was unavailable and the co-conspirator's inculpatory statements lacked sufficient indicia of reliability. Pagan concedes that the court's admission of Riviera's statements pursuant to Fed.R.Evid. 801(d)(2)(E) as a statement of a co-conspirator made during and in furtherance of the conspiracy was proper. *See United States v. Geaney,* 417 F.2d 1116 (2d Cir.1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). Finding that a statement is admissible under the rules of evidence does not end the inquiry into the constitutional issue. *See Dutton v. Evans,* 400 U.S. 74, 89, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970). In *United States v. Puco,* 476 F.2d 1099, 1107 (2d Cir.) (on petition for rehearing), *cert. denied,* 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82 (1973), this court determined that a defendant's right to confront the witnesses against him would not be violated despite the absence of the declarant if the co-conspirator declaration had "sufficient indicia of reliability to assure the trier of fact an adequate basis for evaluating the truth of the declaration...." Most significantly, the statement made in the context of consummating a heroin sale was against Riviera's penal interest when made. *See United States v. Perez,* 702 F.2d 33, 37 (2d Cir.1983) (per curiam), *cert. denied,* —— U.S. ——, 103 S.Ct. 2457, 77 L.Ed.2d 1336 (1983). As such, we find admission of Riviera's taped statement did not violate appellant's Sixth Amendment right to confrontation. Riviera's statement made during and in furtherance of the conspiracy bore sufficient

indicia of reliability to provide the jury with an adequate basis for evaluating the truth of the declaration.

The judgment of conviction is reversed and the matter is remanded for a new trial.