court and in this case. The trial court is also directed to award costs which arose from the trial.

The clerk of this court has determined that the costs which are attributable to this appeal are taxed by it. The amount awarded is $165.28.

In summary, the Fortiers should be awarded $213,550.71 in damages against Peterson and $61,014.46 in damages against the architect Armstrong. Subject to the other specific changes as written above, the judgment of the district court as to the other matters is affirmed.

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**David W. WARREN,
Defendant-Appellant.**

No. 82–1161.

United States Court of Appeals,
Tenth Circuit.

Oct. 25, 1984.

Bruce C. Houdek, Kansas City, Mo. (James, Millert, Houdek, Tyrl & Sommers, Kansas City, Mo., were on the brief), for defendant-appellant.

Amanda S. Meers, Asst. U.S. Atty., Kansas City, Kan. (Jim J. Marquez, U.S. Atty., Kansas City, Kan., was also on the brief), for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, and BREITENSTEIN and LOGAN, Circuit Judges.

HOLLOWAY, Chief Judge.

Defendant David W. Warren, a practicing osteopathic physician in Kansas City, Missouri, was convicted after a jury trial of three counts of mail fraud in violation of 18 U.S.C. §§ 1341 & 2.[1] Defendant appeals his conviction on the grounds that (1) the outrageous conduct of the Government investigators violated the Due Process Clause of the Fifth Amendment; (2) there was insufficient evidence to support the guilty verdict; (3) the trial court failed to properly instruct the jury on the elements of the offense under 18 U.S.C. § 1341; and (4) the trial court abused its discretion in denying defendant's motion for disclosure of proceedings before the grand jury. We disagree with all of defendant's contentions and affirm.

I

*Facts*

In 1980, United States postal inspectors in Kansas City, Missouri, began an undercover operation directed at insurance fraud by doctors and lawyers. The operation was dubbed "MAIL-Fraud" (Medical And Insurance Liability Fraud). The inspectors conducted the undercover operation as follows.

First, the inspectors purchased automobile insurance policies under fictitious names for non-existent automobiles from insurance companies with claims offices in Kansas. III R. 82; VI R. 134–35. Second, the inspectors, with the cooperation of the Kansas City Police Department, prepared false accident reports. III R. 9–11, 82–83; IV R. 142; V R. 45. Third, Kansas City police officers prepared traffic tickets charging the inspectors with violations of municipal traffic ordinances. III R. 11–13. Fourth, the inspectors appeared in municipal court and entered pleas of guilty to the falsified charges under their assumed identities. III R. 13; V R. 60, 104–08 (motion hearing).

Four agents testified that they contacted an attorney to represent them in filing

---

1. The district court sentenced defendant to three years' imprisonment on each count, with the sentences imposed on counts 4 and 5 to run concurrently with the sentence imposed on count 3, and with the defendant to become eligible for parole under 18 U.S.C. § 4205(b)(2) at such time as the Parole Commission may determine. II R. 153.

claims against their insurance company.[2] The attorney advised the agents to consult a physician and obtain a medical report to augment their claims against the insurance company. The agents then went to defendant Warren's office. They told defendant that although they were not injured in the accidents, they wanted to reach a settlement with their insurance company. Defendant arranged numerous office visits for each agent; during these visits the agents often received no medical treatment. Defendant then submitted falsified medical reports to the attorney, who forwarded them to the insurance company. Defendant falsely stated that the agents were partially disabled, and charged for some treatments that were never given and for an inflated number of office visits.[3]

The three mail fraud counts on which defendant was convicted were based on a letter from the attorney to the insurance company's claims adjuster transmitting medical bills and reports prepared by defendant (Count 3), and letters from the claims adjuster to the attorney transmitting settlement drafts and releases (Counts 4 and 5).

## II

### The claim of outrageous governmental conduct

Defendant argues that the conduct of the postal inspectors was so outrageous as to violate due process. Defendant contends that "the deliberate misuse of the judicial system and falsification of official reports by law enforcement offices" requires reversal of his conviction. Reply Brief of Appellant 3. We disagree.

The Supreme Court has stated that it "may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973); *see also Hampton v. United States*, 425 U.S. 484, 491–95, 96 S.Ct. 1646, 1650–52, 48 L.Ed.2d 113 (1976) (Powell and Blackmun, JJ., concurring); *id.* at 495–500, 96 S.Ct. at 1652–1655 (Brennan, Stewart and Marshall, JJ., dissenting). Yet Justice Powell has cautioned that "[p]olice overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar a conviction." *Id.* at 495 n. 7, 96 S.Ct. at 1653 n. 7.

We recognize that undercover activities are "a recognized and permissible means of investigation." *United States v. Russell*, 411 U.S. at 432, 93 S.Ct. at 1643.[4] Federal courts therefore should not exercise a " 'chancellor's foot' veto over law enforcement practices of which [they do] not approve." *Id.* at 435, 93 S.Ct. at 1644. The outrageous governmental conduct defense is manifestly reserved for only "the most intolerable government conduct."

2. This attorney was acquitted of the mail fraud charges brought against him. II R. 139–42.

3. Inspector Armstrong testified that he visited defendant's office eleven times and received heat treatment on only five of these visits. Defendant billed the insurance company for twenty-two treatments and received $715. III R. 86–92.

　Inspector Glick testified that she visited defendant's office on fifteen occasions. Defendant billed the insurance company for twenty-two treatments and received $870. *Id.* at 110–13.

　Inspector Gillis testified that she visited defendant's office four times and received no medical treatment. Defendant billed the insurance company $1020 for twenty-eight visits. *Id.* at 132–35.

　Inspector Bush testified that he visited defendant's office on four occasions and received no medical treatment. Defendant billed the insurance company for twenty-eight visits and received $1,020. IV R. 143–51.

4. We have stated that "[t]o obtain evidence of certain crimes undercover agents frequently must participate in illegal activities." *United States v. Monaco*, 700 F.2d 577, 581 (10th Cir. 1983). We also have noted that government agents may "employ appropriate artifice and deception to ferret out illegal activities." *United States v. Szycher*, 585 F.2d 443, 449 (10th Cir. 1978); *see also United States v. Biswell*, 700 F.2d 1310, 1314 (10th Cir.1983); *United States v. Gurule*, 522 F.2d 20, 23 (10th Cir.1975), *cert. denied*, 425 U.S. 976, 96 S.Ct. 2177, 48 L.Ed.2d 800 (1976).

*United States v. Jannotti,* 673 F.2d 578, 608 (3d Cir.1982).[5]

Neither the Supreme Court[6] nor this court[7] has ever overturned a conviction on the ground of outrageous governmental conduct. Moreover, other courts of appeals have rejected most due process challenges to allegedly improper governmental activity;[8] the only two federal courts of

5. *See also United States v. Ramirez,* 710 F.2d 535, 541 (9th Cir.1983) ("Only extreme misconduct constitutes a due process violation.").

6. *See Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976) (government informant supplied heroin); *United States v. Russell,* 411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973) (undercover policemen supplied necessary chemical for amphetamine production).

7. *See e.g., United States v. Gamble,* 737 F.2d 853, 856–60 (10th Cir.1984) (agents staged phony accidents, prepared false accident reports and traffic tickets, and entered pleas of guilty to the falsified charges under assumed identities); *United States v. Salazar,* 720 F.2d 1482, 1488 (10th Cir.1983) (agents offered to sell food stamps to defendant who merely was "lawfully and peacefully minding his own business"); *United States v. Burrell,* 720 F.2d 1488, 1494–95 (10th Cir.1983) (same); *United States v. Monaco,* 700 F.2d 577, 580–81 (10th Cir.1983) (agents allegedly encouraged informant to engage in criminal acts of prostitution in defendants' parlors, allowed her to use marijuana and cocaine, and permitted her to operate her own prostitution business); *United States v. Biswell,* 700 F.2d 1310, 1313–14, 1314 n. 2 (10th Cir.1983) (agents persisted in offering to sell food stamps to defendant; defendant also alleged that agents' targeting lacked foundation and was not approved by agents' superiors); *United States v. Spitz,* 678 F.2d 878, 880–81 (10th Cir.1982) (agents supplied illegal chemical precursor of methamphetamine); *United States v. Simko,* 662 F.2d 656, 658–60 (10th Cir.1981) (same), *cert. denied,* 455 U.S. 913, 102 S.Ct. 1264, 71 L.Ed.2d 453 (1982); *United States v. Gentry,* 642 F.2d 385 (10th Cir. 1981) (agents supplied illegal chemical precursor of methamphetamine, technical advice and equipment); *United States v. Szycher,* 585 F.2d 443, 445–49 (10th Cir.1978) (agents agreed to pay informer $300 for each person he could "get into a cocaine situation," informer distributed and used cocaine, and agents pressured defendant to purchase cocaine from them); *United States v. Spivey,* 508 F.2d 146, 147–51 (10th Cir.) (informer invited defendant to live with him and "held pot parties" for defendant and neighbors; informer not present when defendant sold heroin to customers obtained for him by informer), *cert. denied,* 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975).

8. *See, e.g., United States v. Dyman,* 739 F.2d 762, 768–69 (2d Cir.1984) ("extensive government involvement with criminal activity" through informant's participation in planning and executing bank robbery); *United States v. Leroux,* 738 F.2d 943, 948 (8th Cir.1984) (agent purchased stolen vehicle from defendant); *United States v. O'Connor,* 737 F.2d 814, 817–18 (9th Cir.1984) (agents offered cocaine to defendants in exchange for settlement of debt); *United States v. Puett,* 735 F.2d 1331, 1335 (11th Cir.1984) (agents allegedly exploited defendant's severe financial problems); *United States v. Thoma,* 726 F.2d 1191, 1198–99 (7th Cir.1984) ("undercover operation of an inherently clandestine activity [mailings of child pornography]"); *United States v. Haimowitz,* 725 F.2d 1561, 1577 (11th Cir.1984) ("undercover operation created entirely by the government"); *Kett v. United States,* 722 F.2d 687, 689–90 (11th Cir.1984) (agents supplied cocaine); *United States v. Pagan,* 721 F.2d 24, 26–27 (2d Cir.1983) (agent allegedly induced defendant to make one-time sale of drugs, offered to pay informant on contingency basis and failed to supervise informant); *United States v. Silvestri,* 719 F.2d 577, 580–82 (2d Cir.1983) (ABSCAM); *United States v. Weisz,* 718 F.2d 413, 440–41 (D.C.Cir.1983) (ABSCAM); *United States v. Garrett,* 716 F.2d 257, 274–75 (5th Cir.1983) (agents "entangled" defendant with alleged "underworld leader"); *United States v. McCown,* 711 F.2d 1441, 1449–50 (9th Cir.1983) (agents distributed marijuana samples in setting up sale of drugs and firearms); *United States v. Ramirez,* 710 F.2d 535, 539–41 (9th Cir.1983) (police allegedly bribed and coerced defendant into working as informer and instructed him to enter into criminal conspiracy in order to set up narcotics arrest); *United States v. Kelly,* 707 F.2d 1460, 1468–74 (D.C.Cir.) (per curiam) (ABSCAM), *cert. denied,* —— U.S. ——, 104 S.Ct. 1264, 78 L.Ed.2d 247 (1983); *United States v. Lomas,* 706 F.2d 886, 890–91 (9th Cir.1983) (agent offered to supply cocaine and facilitated its purchase); *United States v. Jannotti,* 673 F.2d 578, 606–10 (3d Cir.) (en banc) (ABSCAM), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); *United States v. Tobias,* 662 F.2d 381, 386–87 (5th Cir.1981) (agents established chemical supply company to detect manufacturer of illicit drugs and urged defendant to manufacture amphetamines after he had cancelled order for supplies to produce cocaine), *cert. denied,* 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982); *United States v. Gray,* 626 F.2d 494, 498 (5th Cir.) (agents suggested smuggling scheme and provided repair service, airstrip, and crew; court noted that "the providing of essential services is not misconduct"), *cert. denied,* 449 U.S.

appeals cases upholding outrageous governmental conduct defenses have involved facts readily distinguishable from the present case.[9]

We rejected a claim of outrageous governmental conduct on very similar facts in *United States v. Gamble,* 737 F.2d 853 (10th Cir.1984). *Gamble* involved the same undercover investigation at issue here. The defendant was a physician practicing in Kansas City. The undercover inspectors staged phony accidents, prepared false accident reports and traffic tickets, and entered pleas of guilty to the falsified charges under their assumed identities.

We held that "[a] defendant may not invoke the Due Process Clause, however, unless the government's acts, no matter how outrageous, had a role in inducing the defendant to become involved in the crime." *Id.* at 858. We concluded that the inspectors' fabrications were not so outra-geous as to violate due process because that conduct did not itself induce defendant to commit insurance fraud. We stated that the inspectors "displayed shocking disregard for the legal system. But the actions did not directly induce defendant to participate in the fraudulent scheme .... [D]efendant did not rely on any display of fictitious credentials or falsified documents; apparently he relied entirely upon what his 'patients' told him." *Id.* at 859. We reached this conclusion even though the defendant there "had no criminal record and ... the agents had no apparent hint of [defendant's] predisposition to criminal activity." *Id.*

We similarly must hold here that the inspectors' conduct in preparing phony accident reports and traffic tickets, and in entering pleas of guilty to the falsified charges under their assumed identities, did not violate due process.[10] There is no indi-

1038, 101 S.Ct. 616, 66 L.Ed.2d 500 (1980); *United States v. Leja,* 563 F.2d 244 (6th Cir.1977) (agents provided chemicals necessary to produce PCP and technical instructions concerning manufacturing process), *cert. denied,* 434 U.S. 1074, 98 S.Ct. 1263, 55 L.Ed.2d 780 (1978).

**9.** *See United States v. Twigg,* 588 F.2d 373 (3d Cir.1978) (agents suggested setting up drug laboratory, supplied plant, chemicals, glassware and knowhow, and did most of the manufacturing of the narcotics); *Greene v. United States,* 454 F.2d 783 (9th Cir.1971) (during period of long duration, Government supplied large amount of sugar for manufacture of bootleg whiskey and was only purchaser of final product).

The Ninth Circuit has explained that "[i]n the two cases in which federal appellate courts have squarely upheld an outrageous government conduct argument, the defendants would not have had the capacity to commit the crimes without the government's assistance." *United States v. Lomas,* 706 F.2d 886, 891 (9th Cir.1983); *see also United States v. McCown,* 711 F.2d 1441, 1449–50 (9th Cir.1983); *United States v. Ramirez,* 710 F.2d 535, 540 (9th Cir.1983) ("In both cases the outrageous misconduct was, in effect, the generation by police of new crimes merely for the sake of pressing criminal charges against the defendant."); *id.* at 539–40 & 540 n. 4; *cf., Kett v. United States,* 722 F.2d 687, 689 (11th Cir.1984) (quoting *United States v. Tobias,* 662 F.2d 381, 386 (5th Cir.1981), *cert. denied,* 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982)) ("[A]lthough a government agent may provide something of value to a criminal enter-prise, he 'may not instigate the criminal activity, provide the place, equipment, supplies and knowhow, and run the entire operation with only meager assistance from the defendants.' ").

In *United States v. Gentry,* 642 F.2d 385 (10th Cir.1981), we distinguished *Twigg* by explaining that "[i]n that case the illegal activity *began at government instigation." Id.* at 387 (emphasis added). *See also United States v. Gamble,* 737 F.2d 853, 857 (10th Cir.1984) (discussing *Twigg* and *Greene*); *United States v. Biswell,* 700 F.2d 1310, 1314 (10th Cir.1983) (discussing *Twigg*). The Third Circuit has distinguished *Twigg* by noting that in that case "it was the DEA agents who 'set up' the defendant, 'encouraged him' and 'provided the essential supplies and technical expertise.'" *United States v. Jannotti,* 673 F.2d 578, 608 (3d Cir.) (en banc), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982).

**10.** Defendant's other arguments relating to allegedly outrageous governmental conduct are without merit. Defendant attempts to show outrageous governmental conduct by, *inter alia:* the lack of evidence concerning defendant's predisposition to commit such crimes or his having filed fraudulent insurance claims in the past; the lack of evidence that "other conventional investigative techniques would not be productive" or that the postal inspectors here had tried such "conventional investigations" in the past; the failure to examine defendant's claim files in other cases; the inspectors' violations of state statutes and local ordinances in the course of their investigation; the granting of a motion for

cation in our record that defendant relied in any way on the phony accident documents or guilty pleas in submitting the falsified medical reports and bills. In these circumstances, we cannot say that the inspectors' conduct was so outrageous that "due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. at 431–32, 93 S.Ct. at 1642–43.

### III

### *Sufficiency of the evidence*

Defendant contends that there was insufficient evidence to support his conviction of mail fraud under 18 U.S.C. § 1341.[11] We disagree.

■ The elements of mail fraud under § 1341 are (1) a scheme or artifice to defraud or obtain money or property by false pretenses, representations or premises; and (2) use of the United States mails for the purpose of executing the scheme. *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *United States v. White*, 673 F.2d 299, 302 (10th Cir.1982). In viewing the sufficiency of the evidence to support defendant's conviction, we must view the evidence in the light most favorable to the Government. *Hamling v. United States*, 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974); *Glasser v. United States*, 315 U.S. 60, 80,

62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Gatewood*, 733 F.2d 1390, 1392 (10th Cir.1984).

■ Defendant does not take issue with the sufficiency of the evidence relating to a scheme to defraud. Instead, he argues that he did not cause the use of the mails to further the scheme to defraud. We conclude that there is sufficient evidence to support the conviction under § 1341. Correspondence between the attorney and the claims adjuster from the inspectors' insurance company formed the basis of the mail fraud counts upon which defendant was convicted. The first correspondence was a demand letter from the attorney to the claims adjuster. The subsequent letters transmitted settlement drafts from the claims adjuster to the attorney. Defendant had submitted falsified medical reports and bills to the attorney and was later reimbursed from the insurance company's settlement.

■ The Supreme Court has held that one causes the use of the mails when he "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." *Pereira*, 347 U.S. at 8–9, 74 S.Ct. at 362–363 (*quoted in United States v. Maze*, 414 U.S. 395, 399, 94 S.Ct. 645, 647, 38 L.Ed.2d 603 (1974)); *see also United States v. Roylance*, 690 F.2d 164,

---

acquittal in a separate case against an attorney indicted in the MAIL-fraud investigation in part because the inspectors' conduct *in that case* "shocked the conscience of the Court" and there was some evidence that certain inspectors told the defendant *in that case* that they *had* suffered some injuries as a result of the accident (unlike the instant case in which the agents testified that they told defendant they had no injuries). Brief of Appellant 19–23.

Assuming, *arguendo,* that these assertions are true, they do not support a finding of outrageous governmental conduct here. For example, we have rejected the view that outrageous governmental conduct may be shown on the basis of lack of evidence of a defendant's predisposition to commit the offense; "the government need not have a reasonable suspicion of wrongdoing in order to conduct an undercover investigation of a particular person." *Gamble,*

737 F.2d at 860. *See also United States v. Biswell,* 700 F.2d 1310, 1314 (10th Cir.1983).

11. The applicable parts of the mail fraud statute provide as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting to do so ... knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any [matter or thing whatever to be sent or delivered by the Postal Service] shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1341.

167 (10th Cir.1982); *United States v. Curtis*, 537 F.2d 1091, 1095 (10th Cir.1976); *Marvin v. United States*, 279 F.2d 451, 454 (10th Cir.1960). Although the mailing must be in furtherance of the scheme, "it is not necessary that the scheme contemplate the use of the mails as an essential element." *Pereira*, 347 U.S. at 8, 74 S.Ct. at 362 (*quoted in Maze*, 414 U.S. at 400, 94 S.Ct. at 648).

The crucial question here is "whether these mailings were sufficiently closely related to [defendant's] scheme to bring his conduct within the statute." *Maze*, 414 U.S. at 399, 94 S.Ct. at 648. *See also Kann v. United States*, 323 U.S. 88, 95, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944); *United States v. Primrose*, 718 F.2d 1484, 1489 (10th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984). Defendant argues that "[t]here was absolutely no evidence in the record that the defendant Warren knew or anticipated that the insurance company and the attorney would in fact use the mails in this manner." Brief of Appellant 24. We have examined the record and are convinced that there was sufficient evidence that the settling of claims, including medical payments, in the ordinary course of the insurance business contemplated the use of the mails and that such use of the mails was reasonably foreseeable.

The insurance adjuster here testified concerning the routine use of the mails in settling insurance claims, including medical payments. III R. 26, 33–38, 51–56. We feel the evidence was sufficient to support an inference that acts were done by defendant with knowledge that use of the mails would follow in the ordinary course of business, or that such use could reasonably be foreseen even though it was not actually intended, thus causing use of the mails. *Pereira*, 347 U.S. at 8–9, 74 S.Ct. at 362–363. The Third Circuit held in similar circumstances that:

> The evidence in this case shows that the mails were used to obtain approval of the defendant's [fraudulent] applications for insurance payments and to send checks from the insurance companies' main offices in Iowa to local agents in Florida who transmitted the checks to the defendants. Such use of the mails by adjusters, local agents, and insurance companies as part of the usual business practice in settling and paying claims was reasonably foreseeable by the defendants and was an essential step in the process by which they obtained the fruits of their plot.

*Glenn v. United States*, 303 F.2d 536, 541 (3d Cir.1962).

In *United States v. Gamble*, 737 F.2d 853 (10th Cir.1984), we relied on *Glenn* in upholding the mail fraud conviction of a physician under § 1341. In *Gamble*, a claims adjuster testified that he routinely used the mails to request medical reports and to send out settlement drafts. In addition, Gamble admitted that he knew the mails would be used to execute the scheme, *id.* at 855–56, which knowledge was not admitted by defendant here.

Defendant attempts to avoid the conclusion in *Glenn* by arguing that the insurance adjuster and the attorney here *could* have settled the claims without resort to the mails because the physical distance between them (Kansas City, Missouri to Overland Park, Kansas) was far less than the distance in *Glenn* (Iowa to Florida). *See* Reply Brief of Appellant 7–8. This facile distinction ignores the evidence which supports an inference that use of the mails could be foreseen.

*United States v. Perkal*, 530 F.2d 604 (4th Cir.), *cert. denied*, 429 U.S. 821, 97 S.Ct. 70, 50 L.Ed.2d 82 (1976), supports our holding. In that case, the Fourth Circuit affirmed the conviction of a doctor under § 1341 who participated in a scheme to defraud an insurance company by submitting inflated and false claims of disability and medical expenses arising out of automobile accidents, even though the doctor himself did not mail the fraudulent medical bills and reports. *See also United States v. Reicin*, 497 F.2d 563 (7th Cir.) (discussing scheme of doctor and attorney to de-

fraud insurance company by submitting false medical reports), *cert. denied,* 429 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974); *United States v. Sternback,* 402 F.2d 353 (7th Cir.1968) (affirming conviction of physician under § 1341 who prepared false medical reports and bills in connection with insurance claimants who had been involved in automobile accidents), *cert. denied,* 393 U.S. 1082, 89 S.Ct. 862, 21 L.Ed.2d 774 (1969).

For the above reasons, we conclude that there was sufficient evidence to support defendant's conviction under § 1341.

## IV

### *Jury instructions*

█ Defendant challenges the district court's refusal to give his requested instruction that the use of the mails must be an "integral part" of the scheme to defraud.[12] The district court did not give the requested instruction because it believed that its instructions adequately covered the elements of § 1341. IV R. 176. We agree.

The district court instructed the jury that in order to find defendant guilty of violating § 1341, it must find "[t]he act or acts of so using or causing the use of the United States mails wilfully, and with the specific intent to carry out *some essential step* in the execution of said scheme or artifice to defraud, or to attempt to do so as charged." II R. 110 (emphasis added). This language is patterned after 2 E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* § 47.05 (1977). Another instruction stated that § 1341 required a finding that defendants have mailed or caused to be mailed, "with the intent to

carry out *some essential step* in the execution of the scheme to defraud." II R. 112 (emphasis added). This instruction is patterned after § 47.08 of Devitt and Blackmar. We believe these instructions satisfy the requirement in *Pereira* that the mailing be "incident to an *essential part* of the scheme." 347 U.S. at 8, 74 S.Ct. at 363 (emphasis added). *Cf. United States v. Brien,* 617 F.2d 299, 311–12 (1st Cir.) (emphasis added) (Upholding, on other grounds, instruction stating that "[i]f you find that the particular mailing was not sent with the intent to carry out an *essential step* in a scheme to do fraud, then you must reach a not guilty verdict as to that mailing.... In order to reach a guilty verdict as to any particular mailing alleged in the indictment, you must find beyond a reasonable doubt that the mailed article in question was sent with the intent to carry out an *essential step* in the alleged scheme to defraud."), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980).

Defendant also renews his objection to the following instruction given by the district court: "The punishment provided by law for the offenses charged is a matter exclusively within the province of the court and may not be considered by the jury in any way in arriving at a verdict as to the guilt or innocence of the defendant." II R. 131. This instruction is patterned after 1 E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* § 18.02 (1977). We recognize that "[i]nformation about sentencing or other consequences of a verdict is prejudicial." *United States v. Greer,* 620 F.2d 1383, 1385 (10th Cir.1980). Indeed, defendant's counsel admitted at

---

**12.** Defendant's requested instruction read as follows:

> You are instructed that not every use of the mails in connection with a scheme to defraud is a federal mail fraud violation. The mail fraud statute does not reach all frauds but only those limited instances in which use of the mails is an integral part of the execution of the scheme.
>
> Accordingly, for each item allegedly mailed, you must determine the extent of the contribution, if any, the mailing of the item made to the success of the scheme and artifice to de-

fraud. In other words, you must determine whether the use of the mails was an integral part of the scheme, and necessary to execute it.

> If the prosecution fails to prove beyond a reasonable doubt that the mailing of the particular item alleged in each mail fraud count was for the purpose of executing the scheme to defraud and not a mere tangential or incidental use of the mails, you must acquit the defendant of mail fraud.

I R. 94.

trial that the district court's instruction reflects "the present state of the law." IV R. 182. Accordingly, defendant's argument that such an instruction must "include a statement that the charges against the defendant were serious felonies and that if convicted a substantial term of imprisonment could be assessed on each charge"[13] is without merit.

## V

### *Disclosure of grand jury proceedings*

Defendant argues that the district court erred in refusing to order disclosure of testimony before the grand jury. Defendant points to alleged perjury by the inspectors concerning whether they told defendant that they had suffered no injuries in the accident. The district court held that defendant made "an insufficient showing" to require disclosure of the entire grand jury proceedings. VI R. 215.[14] We agree.

■ There is "a long-established policy that maintains the secrecy of the grand jury proceedings in the federal courts." *United States v. Proctor & Gamble Co.,* 356 U.S. 677, 681, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958) (footnote omitted). The Supreme Court has stated that "the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 218, 99 S.Ct. 1667, 1672, 60 L.Ed.2d 156 (1979). The Court consistently has held that Fed.R. Crim.P. 6(e)(3)(C)(i) requires a strong showing of particularized need before grand jury materials are disclosed. *See United States v. Sells Engineering, Inc.,* 463 U.S. 418, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983); *see also Illinois v. Abbott & Associates, Inc.,* 460 U.S. 557, 567 & n. 14, 103 S.Ct. 1356, 1361 & n. 14, 75 L.Ed.2d 281 (1983); *Douglas Oil,* 441 U.S. at 217–24; *Pittsburgh Plate Glass Co. v. United States,* 360

U.S. 395, 400, 79 S.Ct. 1237, 1241, 3 L.Ed.2d 1323 (1959).

Rule 6(e)(3)(C)(ii) of the Federal Rules of Criminal Procedure provides that disclosure of grand jury materials may be had "when permitted by a court at the request of the defendant, upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury." Fed.R. Crim.P. 6(e)(3)(C)(ii). We must examine whether the district court abused its discretion in denying defendant's motion for disclosure of the grand jury material. *See, e.g., United States v. Cronic,* 675 F.2d 1126, 1130 (10th Cir.1982), *rev'd on other grounds,* —— U.S. ——, 104 S.Ct. 2039, 80 L.Ed.2d 656 (1984); *In re September 1975 Grand Jury Term,* 532 F.2d 734, 737 (10th Cir.1976) ("The proceedings before the grand jury are secret. Breach of that secrecy rests in the sound discretion of the trial court."); *United States v. Parker,* 469 F.2d 884, 889 (10th Cir.1972) ("The determination of whether 'a particularized need' existed [for disclosure of grand jury materials] is peculiarly a matter resting in the sound judicial discretion of the trial court.").

■ The evidence at trial indicated that the inspectors told defendant that they had not suffered any injuries in the accidents. *E.g.,* II R. 86–87, 96 (testimony of inspector Armstrong); *id.* at 130 (testimony of inspector Gillis); IV R. 145 (testimony of inspector Bush). The purportedly inconsistent statements relied on by defendant in his brief all concern statements made by the inspectors to persons other than defendant and involve other cases resulting from the mail-fraud investigation. *See* Brief of Appellant 35–38. We cannot say that in these circumstances the district court abused its discretion in concluding that defendant did not make the requisite

---

13. Brief of Appellant 32; *see also* Reply Brief of Appellant 9–10.

14. The district court ordered that the prosecution disclose all material under the Jencks Act, 18 U.S.C. § 3500, and under *Brady v. Maryland,*

373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Defendant does not contend on appeal that the prosecutor violated his duty to disclose under these requirements.

showing of particularized need [15] necessary to justify disclosing the grand jury materials.[16]

## VI

### Conclusion

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

**15.** Defendant concludes his argument on this issue by stating that "[w]here the Government loses half of the defendants in an investigation because they cannot prove the allegations of the indictments, the Grand Jury must have been misled in order to have returned them." Reply Brief of Appellant 12. Unsuccessful prosecutions against other defendants indicted in the MAIL-fraud investigation do not constitute "particularized need" supporting defendant's argument for disclosure of the grand jury materials.

**16.** For other cases where courts have held that the defendant has not made a sufficiently strong showing to justify disclosure of grand jury materials, see *Lucas v. Turner,* 725 F.2d 1095, 1099–1109 (7th Cir.1984); *United States v. Bennett,* 702 F.2d 833, 836 (9th Cir.1983); *Matter of Grand Jury Proceedings, Miller Brewing Co.,* 687 F.2d 1079, 1093 (7th Cir.1982); *In re Grand Jury Matter,* 682 F.2d 61, 63–67 (3d Cir.1982). *See also* 1 C. Wright, *Federal Practice and Procedure* § 108, at 263 (1982) ("Generally requests to see grand jury minutes under [Fed.R.Crim.P. 6(e)(3)(C)(ii) ] have been denied. . . .").