UNITED STATES of America, Appellee,

v.

Delwright T. DYMAN, Cosimo Mezzapella, a/k/a Joe Cosimo, a/k/a Joseph Rusello, Richard D. Spainhower and Joseph A. Valentino, Appellants.

Nos. 613, 635, 636 and 639, Dockets 83–1206, 83–1207, 83–1208 and 83–1209.

United States Court of Appeals,
Second Circuit.

Argued Feb. 1, 1984.

Decided July 9, 1984.

Thomas D. Clifford, Hartford, Conn. (Skelley, Clifford, Vinkels, Williams and Rottner, P.C., Hartford, Conn., of counsel), for appellant Joseph A. Valentino.

Richard S. Cramer, Hartford, Conn. (Joseloff, Joseloff & Cramer, Hartford, Conn., of counsel), for appellant Richard D. Spainhower.

M. Hatcher Norris, Glastonbury, Conn., for appellant Delwright T. Dyman.

Paul S. Sherbacow, Hartford, Conn. (Fleischmann, Sherbacow & McWeeney, Hartford, Conn., of counsel), for appellant Cosimo Mezzapella.

Alan H. Nevas, U.S. Atty. for the D. Conn., New Haven, Conn. (Richard N. Palmer, Asst. U.S. Atty. for the D. Conn., Hartford, Conn., of counsel), for appellee.

Before LUMBARD, OAKES and CARDAMONE, Circuit Judges.

LUMBARD, Circuit Judge:

Thanks to information provided by an F.B.I. paid informant, the participants of a scheme to burglarize the Farmington Savings Bank in Farmington, Connecticut, were all captured. Three of the appellants, Cosimo Mezzapella, Richard D. Spainhower and Joseph A. Valentino, were caught inside the bank. The fourth appellant, Delwright T. Dyman, who acted as a lookout, was arrested a few days later. All four now appeal from convictions for bank burglary of a federally insured bank, 18 U.S.C. §§ 2113(a), (f) and 2, and conspiracy to commit bank burglary, 18 U.S.C. § 371, entered in the District of Connecticut, Emmet T. Clarie, J., on May 23, 1983, following jury verdicts of guilty on April 7, 1983.[1]

---

**1.** On the burglary count, Dyman was sentenced to twelve years in prison; Mezzapella, eighteen years; Spainhower, eight years; and Valentino, ten years. All four received five years in prison on the conspiracy count, the sentences to run concurrently. Two other defendants were involved in the burglary. William Bender pleaded guilty before trial to charges of being an accessory to conspiracy to commit bank burglary, 18 U.S.C. §§ 371 and 3, and was sentenced on June 8, 1983, to thirty months in prison. William J. Strawsacker, one of the four defendants caught inside the bank, pleaded guilty during trial to the same charges as Bender, and was

Appellants present three major claims: (1) that the indictments against them should be dismissed because the government misled the grand jury; (2) that the ·level of government involvement in the scheme was so outrageous as to be a violation of their due process rights; and (3) that the district court's instructions· to the jury on the entrapment defense advanced by Mezzapella and Valentino were erroneous. As we find no merit in these or any of the other claims raised by various appellants, we affirm the convictions.

The government's key witness was the F.B.I. informant, Frank Sprenz, an electronics expert with a criminal record which included numerous bank burglaries. Through Sprenz and others, the government introduced evidence supporting the following facts. In the fall of 1980, Sprenz, who had become a paid FBI informant a few months earlier, was introduced by a mutual friend to Mezzapella, also a long-time burglar with numerous convictions. Mezzapella gave Sprenz the address of Valentino, a welder and safecracker in Buffalo, previously unknown to Sprenz. Sprenz travelled to Buffalo to gauge Valentino's interest in participating in an as yet unplanned bank burglary scheme. Although Valentino told Sprenz he was willing to show those involved how to use safecracking equipment, he stated he was not, at the time, interested in participating in a burglary.

Sprenz didn't hear again from Mezzapella until April, 1982, when Mezzapella called him in Vermont, explained that he and a friend were interested in burglarizing a bank in Connecticut, and asked Sprenz to come to the Bronx. Sprenz met Mezzapella as requested, and they then drove to Glastonbury, Connecticut, where they met Delwright Dyman. Dyman told Mezzapella and Sprenz that he thought the Farmington Savings Bank in Farmington, Connecticut, was a good target for a burglary. The three men then drove to Farmington. Late that night, Dyman and Sprenz entered the bank through a rear window which had not

been· wired to the alarm system. After a brief visit, they returned to Glastonbury.

Mezzapella called Sprenz several times during April and May, 1982, and informed him of the problem of financing the equipment needed for the burglary. Meanwhile, Valentino called Sprenz, and expressed his interest in participating in the scheme. On May 8, 1982, Sprenz met Dyman, Mezzapella, and Mezzapella's driver, "Willie," in Glastonbury, and again discussed the proposed burglary.

In early July, 1982, Mezzapella asked Sprenz to come to Farmington to see if he could bypass the alarm system of the bank. Mezzapella and Sprenz again entered the bank through the rear window, and inspected the alarm system. They talked by two-way radio with Dyman, who acted as a lookout and monitored the police frequency with an electronic scanner. When Sprenz told Mezzapella that he could neutralize the alarm, Mezzapella said that he could obtain equipment to burn through the concrete floor of a conference room and into the vault.

Some weeks later, at Mezzapella's request, Sprenz drove to Connecticut, picked up Dyman, and continued on to the Bronx. The three discussed specific roles of participants in the burglary: Sprenz and Dyman would enter the bank early one weekend night and neutralize the ·alarm system; they would then leave the bank and act as lookouts, while Mezzapella and Valentino would cut into the vault. When that was completed, they and the other participants would empty the vault, which they estimated to contain about one thousand safe deposit boxes.

After repeated delays because of equipment problems, Mezzapella finally telephoned Sprenz that the burglary would take place on Saturday to Sunday, October 9–10, 1982. All were to meet in Glastonbury. On Saturday, October 9, Sprenz drove down from Vermont and met Dyman. He and Dyman then stole a van that was to be used in the burglary, and parked it a

sentenced on May 23, 1983, to two years in prison.

mile from the bank. Although Mezzapella, Valentino, and the others were expected to arrive from New York with the equipment, further problems with the equipment forced a postponement.

The next day, Mezzapella called Sprenz, told him he could not find a place to repair the equipment in New York, and asked if he could bring it up to Sprenz's home. Sprenz agreed, and later that day, Valentino, Mezzapella and William Bender arrived in a rented van. Within a few days, Mezzapella and Valentino had completed the necessary repairs, and the burglary was rescheduled for the following weekend.

On Friday, October 15, Mezzapella returned to Sprenz's home with Bender and Richard Spainhower. Valentino arrived by bus from Buffalo the following morning, and he and Mezzapella checked the equipment. Later that day, Sprenz, Valentino, Mezzapella, and Bender drove to Glastonbury, where they met Dyman and William Strawsacker.

Upon arriving at Farmington, sometime after 8:00 P.M., Dyman and Sprenz entered the bank, while the rest waited in a nearby van with the equipment. After Sprenz installed an alarm bypass device, he and Dyman exited the bank through the back door with a key left by bank officials on instructions from the F.B.I. Sprenz then informed the others that all was clear, and he and Dyman took up positions across the street from the bank. They had been instructed by Mezzapella to carry guns. Sprenz did so, but he had loaded his gun with fake bullets.

Bender then drove the van to the rear of the bank. About 9:15 P.M. Mezzapella, Valentino, Strawsacker and Spainhower unloaded the equipment, and carried it into the bank. Bender then drove away, and waited in the parking lot of a nearby restaurant. Within a few minutes, F.B.I.

agents and officers from the Connecticut State Police and the Farmington Police Department arrived and, using bullhorns, informed the four men inside of their presence. When the four did not leave the bank, the police made telephone contact with the burglars inside. After several hours of negotiation, all four surrendered. The equipment recovered from the bank included tanks of nitrogen, oxygen and acetylene gas torches which could easily cut through metal and concrete, and burning bars used to melt metal and disintegrate concrete. Dyman was arrested six days later, on October 21, in the parking lot outside his apartment in Manchester, Connecticut.

Three defendants testified at trial. Valentino and Mezzapella raised a defense of entrapment, claiming that were it not for the government's inducements, they would not have participated in the burglary. Spainhower's defense was that, at the time of the burglary, he was employed as a registered informant of the United States Customs Bureau in New York, and thought that his responsibility in that job was to participate in criminal activities, no matter where, so that he could pass along information to his agent; he, too, testified at trial. Dyman did not testify.

## A. Presentation of Evidence to Grand Jury.

The appellants were tried on a second superseding indictment found on January 7, 1983, by a grand jury in Hartford, Connecticut.[2] Appellants argue that the indictments against them should be dismissed for two reasons: first, that the government misled the grand jury into thinking that F.B.I. Agent Jack Daulton could himself identify the two men who first entered the bank on the night of the burglary; and

2. On October 21, 1982, a Bridgeport grand jury returned an indictment charging Mezzapella, Valentino, Spainhower, Strawsacker and Bender with bank burglary and conspiracy to commit bank burglary. On October 27, a Hartford grand jury returned a superseding indictment charging the same offenses but adding Dyman

as a defendant. On January 7, 1983, a second superseding indictment was returned by the Hartford grand jury, charging the same defendants and offenses, but extending the dates of the conspiracy to include the period from April, 1982, until the burglary.

second, that by not revealing Sprenz's identity, Agent Daulton's testimony misled the grand jury and prevented it from investigating the issue of government inducement to commit the burglary. Although they did not raise these issues before the district court, they now contend that these actions were so egregious as to deny their due process rights. We disagree.

On October 27, 1982, when the government first sought a superseding indictment adding Dyman as a defendant, Daulton testified before the Hartford grand jury that on the night of the burglary, he and Agent Richard Farley were stationed in a shed near the rear of the bank. Daulton initially testified that "we observed two individuals approach the rear of the bank" and continued to observe their conduct. He then stated that Farley was wearing nighttime vision glasses, and that Farley was able to see at least one of the men and identify him as Dyman. Later, while being questioned about "the other man," Daulton stated that he "personally was not observing the rear of the bank, and I was not able to tell who that was, Agent Farley was ...." Thus, appellants argue that Daulton's first statement appeared to be eyewitness testimony, but was really hearsay.

■ The use of hearsay testimony before a grand jury raises questions about the validity of an indictment only when the prosecutor misleads the grand jury into thinking it is getting first-hand testimony when it really is receiving hearsay, *United States v. Estepa*, 471 F.2d 1132, 1137 (2d Cir.1972), or where there is a high probability that if eyewitness rather than hearsay testimony had been used, the defendant would not have been indicted. *United States v. Leibowitz*, 420 F.2d 39, 42 (2d Cir.1969). Neither condition is met here.

■ First, we conclude that the grand jury was not misled as to the nature of Daulton's testimony. Daulton told the grand jury that he was not alone in the shed, and spoke of Farley but not himself as having worn special night vision glasses. Finally, he clarified his initial testimony shortly after it was given, explaining that only Farley had actually identified Dyman.

Furthermore, this is not a situation where if eyewitness rather than hearsay testimony had been used, the defendant would not have been indicted. If anything, eyewitness testimony from Agent Farley would have provided much stronger evidence against Dyman. Presumably, Farley would have testified before the grand jury, as he did at trial, that he observed the rear of the bank and that he was absolutely positive of his identification of Dyman as entering the bank. Thus, Daulton's testimony as to what Farley reported did not prejudice Dyman.

■ Appellants also claim that Daulton's testimony before the grand jury was misleading as to the identity of Frank Sprenz, because Daulton gave the impression that he did not know the identity of the individual with Dyman on the night of the burglary. They contend that, had Sprenz's identity as a government informant been revealed, the grand jury could have summoned Sprenz to testify on the issue of government inducement of defendants.

On October 27, a grand juror brought up the subject of the two men who first entered the bank, and asked "There is still one guy out?" Daulton responded, "That I know of, that we have not been able to identify, yes, sir." Later in that day's testimony, the Assistant United States Attorney asked: "Is it fair to say that, notwithstanding the fact that a certain individual has not been formally arrested and although you are not certain as to who he is, that you have a pretty good idea as to who that is likely to be?" Daulton responded that "... it is fair to say we have a fairly good idea who the person was."

Daulton testified at trial that, at the time of his grand jury testimony, he did not know Sprenz's name. Nevertheless, the F.B.I. at that time knew Sprenz's identity, as it was paying him a salary, and had been made aware of every move he made concerning the burglary. Agent Zabowsky, along with Agent Daulton, met with Sprenz a week before the burglary. On the night

after the burglary, Zabowsky met Sprenz and retrieved the pistol loaded with fake bullets that he had given to Sprenz. During the week following the burglary, the F.B.I. spoke with Sprenz about the phone conversations he had with Dyman, in which Dyman speculated as to why the burglary was broken up.

On this record, it is difficult to believe that, at the time of his grand jury testimony, Daulton was still uncertain of Sprenz's identity, and we see little justification for the government's evasion. If there were reasons for not disclosing Sprenz's identity at that time, it would have been better to explain the situation to the grand jury and ask leave not to disclose the informant's name. Nevertheless, we are convinced that dismissal of the indictment is not warranted. There is no claim here that the prosecutor knowingly withheld evidence negating guilt which, if presented, would "reasonably be expected to lead the jury not to indict." *United States v. Ciambrone*, 601 F.2d 616, 623 (2d Cir.1979). The government put forward enough evidence to establish probable cause that a crime was committed, and that the defendants were reasonably believed to have committed it. That is all it was required to do. *United States v. Romano*, 706 F.2d 370, 374 (2d Cir.1983).

Moreover, when the second superseding indictment was voted on January 7, 1983, the Hartford grand jury was well aware that there was an informant. Agent Daulton testified that the F.B.I. received information in April, 1982, from an informant who had met with Mezzapella and Dyman to discuss burglarizing a bank in Farmington, and who had entered the bank in April, 1982, to examine if for a possible burglary. Even though Sprenz's name was not revealed, the grand jury could have sought more information about "the informant" and the nature of his involvement with the defendants, but did not do so.

"[D]ismissal of an indictment is justified to achieve either of two objectives: to eliminate prejudice to a defendant; or, pursuant to our supervisory power, to prevent prosecutorial impairment of the grand jury's independent role." *United States v. Hogan, supra,* 712 F.2d at 761. Dismissal, however, is "the most drastic remedy," and thus is rarely used. *United States v. Romano, supra,* 706 F.2d at 374, quoting *United States v. Brown,* 602 F.2d 1073, 1076 (2d Cir.1970). Viewing the evidence as a whole, we conclude that such a remedy is not warranted here.[3]

### B. Due Process: Outrageous Government Conduct.

Prior to trial, the appellants asserted that the government's active role in the conspiracy exceeded the limits of fairness mandated by the Due Process Clause of the Fifth Amendment. As we noted in *United States v. Williams,* 705 F.2d 603, 619 (2d Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983), this defense differs from entrapment: whereas the entrapment defense focuses on the state of mind of the defendant as it relates to his predisposition to commit the offense charged, the defense of "outrageous government conduct" recognizes that "extreme cases may arise where the government's conduct is so outrageous as to violate due process, even though the evidence permitted the jury to find that the defendant was predisposed." *See Hampton v. United States,* 425 U.S. 484, 491–95, 96 S.Ct. 1646, 1650–52, 48 L.Ed.2d 113 (1976) (Powell, *J.,* concurring joined by Blackmun, *J.*); *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973).

At a pre-trial hearing, the district court heard testimony from Mezzapella, but reserved decision on the motion to dismiss the indictment until after the jury verdicts. The court held a post-trial hearing at which defense counsel presented additional testi-

---

**3.** Our decision not to require dismissal of the indictment is further supported by the fact that the defendants were convicted, despite the use of an entrapment defense by Valentino and Mezzapella. *See United States v. Romano, supra,* 706 F.2d at 374.

mony in support of defendant's due process claim. On May 23, 1983, the court denied the motion.

■ The appellants argue that they were prejudiced by the district court's failure to hold a full evidentiary hearing before trial, and also that the district court erred when it finally denied the claim on its merits. We disagree.

Judge Clarie's ruling to reserve decision until after trial avoided duplication of testimony, since most of the alleged misconduct would be brought out at trial in connection with the entrapment claims raised by Valentino and Mezzapella. We see no prejudice to the defendants by the court's having employed a post-trial hearing in this case. We tacitly approved such procedure in both *United States v. Williams, supra,* 705 F.2d at 607, 619–22 and *United States v. Myers, supra,* 692 F.2d at 828–29. The defendants had a full chance at the post-trial hearing to present any evidence not brought out during trial, and to re-examine Sprenz and Agent Zabowsky. However, little evidence was brought out that had not already been covered.

■ We agree with the district court's denial of the due process claim on its merits. It is true that the government's involvement in this case, through Sprenz, was extensive. However, extensive government involvement in criminal activity, without more, does not constitute the type of coercive action, *cf. Watts v. Indiana,* 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949) (obtaining confession by interrogation eight hours a day over a six-day period), or outrageous violation of physical integrity, *cf. Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (defendant's stomach pumped to obtain evidence), or other egregious or outrageous government conduct rising to the level of a due process violation. *See United States v. Myers, supra,* 692 F.2d at 837; *Archer v. Commissioner of Corrections,* 646 F.2d 44, 46–47 (2d Cir.), *cert. denied,* 454 U.S. 851, 102 S.Ct. 291, 70 L.Ed.2d 141 (1981). As Justice Powell stated in his decisive concurring opinion in *Hampton v. United States, supra,* "Police overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction." 425 U.S. at 495 n. 7, 96 S.Ct. at 1652 n. 7.

Sprenz testified that it was Dyman's and Mezzapella's idea to burglarize the bank; that Mezzapella supplied the funds to purchase equipment; that throughout the conspiracy and burglary, Sprenz followed instructions from Mezzapella and Dyman; and that Sprenz never pressured Valentino or any other defendant to engage in criminal activity. Although Sprenz was the person who initially contacted Valentino, he did so at Mezzapella's suggestion. Moreover, Sprenz testified that a year and a half later, after no further contact, Valentino volunteered to join the conspiracy. When arrangements had been made, Valentino, with no prompting from Sprenz, travelled alone by bus from Buffalo to Vermont to join the other defendants. This is hardly similar to the situation in *Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), on which Valentino relies heavily, where the evidence showed persistent exploitation of an addict's need for narcotics.

■ Although the government's extensive involvement requires careful scrutiny, the use of informants such as Sprenz is often a necessary tool of law enforcement. The district court was the trier of fact, and its findings must be upheld unless clearly erroneous. *United States v. Myers,* 692 F.2d 823–839 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983). Viewing the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), we conclude that the district court's denial of the due process claim was a proper exercise of its discretion. *United States v. Pagan,* 721 F.2d 24, 27 (2d Cir.1983).

C. *Entrapment.*

At trial Valentino and Mezzapella raised the defense of entrapment. This defense

"focuses on the state of mind of the defendant and precludes conviction only when government agents by their inducements prevail upon a person who was not predisposed to commit the type of crime charged." *United States v. Williams, supra,* 705 F.2d at 619. The district court instructed the jury at length on the defense. During its deliberation, the jury asked the court to explain the law of entrapment again, and the court did so. Appellants, both jointly and separately, assert claims of error in the district court's instructions. We find no merit in these claims.

■■■ Appellants' first claim, that the district court's charge on predisposition did not adequately explain the need for the jury to find that defendants were predisposed to violate the law before any inducement from law enforcement officers or their agents occurred, *United States v. Valencia,* 645 F.2d 1158, 1162–63 (2d Cir. 1980), need not long detain us. First, as defendants did not object to the charge on this issue, this claim is reviewable only for plain error in the district court's instructions. Fed.R.Crim.P. 52(b); *United States v. Glazer,* 532 F.2d 224, 227 (2d Cir.), *cert. denied,* 429 U.S. 844, 97 S.Ct. 123, 50 L.Ed.2d 115 (1976). Second, the court charge was in all respects proper. The district court charged, in pertinent part:

> Thus, if the prosecution has satisfied you, beyond a reasonable doubt, that the defendants were ready and willing to commit the offenses charged and merely were awaiting a favorable opportunity to commit them, then you may find that the Government did no more than furnish a convenient opening for the criminal activity in such circumstances, you may find that the Government agents have not seduced an innocent person, but have only provided the means for the defendants to effectuate or realize their own existing purposes.

> On the other hand, if you have a reasonable doubt that the defendants would have committed the offenses charged, without the Government's inducement, then it is your duty to acquit them.

The court repeated this charge when the jury requested clarification on the law of entrapment. We have, on several occasions, approved the use of the phrase "ready and willing" to convey to a jury the requirement that, once defendant's attention is called to the opportunity to commit a crime, the decision to commit the offense be shown to be his own choice and "not the product of Government persuasion." *United States v. Williams, supra,* 705 F.2d at 618; *United States v. Myers, supra,* 692 F.2d at 849.

Next, appellants claim that the district court erred when it did not specifically instruct the jury, as defense counsel had requested, that the defendants' prior convictions, even if for offenses similar to the ones alleged here, did not require the jury to conclude defendants were predisposed to commit the offenses now charged. This claim is also without merit.

■■■ During the court's initial instruction, it told the jury that it was "free to consider Valentino's prior criminal record on the issue of whether defendant Valentino is predisposed, in light of that criminal record, to commit this particular crime of burglary." When the jury requested further instructions, defense counsel again renewed the specific request above. The court added language to its previous charge, stating:

> In determining this question of predisposition or willingness, you may consider evidence of the prior conduct of a defendant, including his criminal record, if any. You may consider such evidence, however, solely in connection with your determination of his predisposition or readiness to commit the offense with which he is now charged.

> It is not evidence that he actually committed the offense with which he is now charged; moreover, the fact, if it is a fact, that a defendant may have a criminal record or may have committed prior offenses of similar character, does not require you to so conclude.

Although the court did not use the exact language then requested by the defendants, it was not required to do so. As long as the substance of the requested charge was given, the defendant has no cause to complain. *United States v. Taylor*, 562 F.2d 1345 (2d Cir.1975). When the court told the jury that it "may" consider evidence of prior crimes in determining predisposition, it clearly intimated that the jury was not bound to find predisposition by virtue of those convictions.[4]

Valentino claims that the district court erred in refusing to charge the jury that, on the issue of predisposition, the jury should consider Valentino's vulnerable personality rather than the self-control possessed by the average person.

A psychiatrist, Dr. Borden, testified that when he examined Valentino in February, 1983, Valentino knew right from wrong and was mentally competent, but was "addicted to burglaries." Judge Clarie told the jury that it could "give the testimony of Dr. Borden such weight as you think it deserves, based upon his professional training, experience and judgment." He then instructed the jury that its job was to decide "whether the Government agents merely afforded an opportunity to Valentino, who was otherwise ready and willing to violate the law, or whether they induced an otherwise innocent person to commit a crime," and that, "in considering Dr. Borden's testimony, if you find that because of Valentino's intelligence or personality structure, he was not ready and willing to

commit the crimes of burglary and conspiracy as alleged here, were it not for the inducement by the Government's agents, then you would acquit the defendant on the grounds of entrapment." The court fairly presented Valentino's claim and properly instructed the jury.[5]

### D. *Spainhower: Right to Self-Representation.*

Spainhower claims that he was deprived of his Sixth Amendment right to self-representation because his standby trial counsel, Richard Cramer, played too substantial a role at trial. We disagree.

Although a defendant has a Sixth Amendment right to represent himself if he knowingly and voluntarily decides to do so, a trial court may appoint standby counsel, even over the defendant's objection, to aid the defendant in presenting his case when the defendant requests help. *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975). Even when standby counsel makes unsolicited remarks, a defendant's rights are not necessarily violated. Rather, the proper scope of inquiry is "on whether the defendant had a fair chance to present his own case in his own way." *McKaskle v. Wiggins*, —— U.S. ——, 104 S.Ct. 944, 946, 79 L.Ed.2d 122 (1984).

The record leaves no doubt that Spainhower's Sixth Amendment rights were protected. Spainhower conducted his own defense. Without any assistance from

---

**4.** The only case cited on this issue, *United States v. Hairrell*, 521 F.2d 1264 (6th Cir.), *cert. denied*, 423 U.S. 1035, 96 S.Ct. 568, 46 L.Ed.2d 409 (1975), is inapposite. There, extensive evidence of crimes unrelated to the offense charge was introduced to show predisposition. Here, all of Valentino's prior convictions, and most of Mezzapella's, were for burglaries.

**5.** Valentino and Mezzapella also take issue with the district court's instruction to the jury that "if you find that there is some evidence that agents of the Government induced Mezzapella and Valentino to commit the crimes charged, the Government must prove beyond a reasonable doubt that the inducement was not the cause of the crimes." They claim that the evidence

showed inducement.as a matter of law, and thus that this issue should not have gone to the jury. We disagree.

Once again, appellants waived this claim by not raising it below after the instructions were given. In any event, the claim is meritless. Sprenz was the only government agent who ever dealt with any defendant, and he testified that he did not in any way induce any defendant to participate either in the conspiracy or the burglary. As defendants introduced no more than conclusory allegations.to the contrary, it was entirely proper for the court to leave to the jury the determination whether to believe the government or the defendants on the inducement issue.

counsel, he cross-examined all witnesses, testified on his own behalf, and gave his own closing argument to the jury. By contrast, Cramer's involvement was minimal. Of the three times he spoke in the jury's presence, two were upon Spainhower's request, and the third helped Spainhower articulate a response to the government's objection during Spainhower's direct examination of one of his witnesses. We conclude that he presented "his own case in his own way," *McKaskle v. Wiggins, supra.*

### E. Instructions to Jury on Spainhower's Defense Theory.

Spainhower claims that the district court did not instruct the jury with respect to his claim that he was acting as a government agent at the time he committed the acts involved in the charged offenses. Specifically, Spainhower wanted the court to instruct the jury that a defendant who honestly believes he is a government agent cannot have the requisite intent to commit larceny, even if that belief is negligently or foolishly held.

A defendant "is entitled to have instructions presented relating to any theory of defense for which there is any foundation in the evidence, no matter how weak or incredible." *United States v. Alfonso-Perez,* 535 F.2d 1362, 1365 (2d Cir.1976), quoting *United States v. Platt,* 435 F.2d 789, 792 (2d Cir.1970). We are satisfied that the district court properly instructed the jury on Spainhower's theory of the case. The court explained that the prosecution must prove that the defendant "entered said bank with the intent to commit larceny"; that Spainhower offered evidence, for the purpose of rebutting the element of intent to commit larceny, of his being an informant at the time of the burglary, and that such evidence could be used in determining his state of mind. The court then elaborated on the requirements for bank burglary and conspiracy, specifically stating that "[p]articipation is willful if done voluntarily

and purposely and with specific intent to do some act which the law forbids; that is to say with bad purpose either to disobey or to disregard the law," and that "[m]ere knowledge that a crime is being committed, even when coupled with presence at the scene, without more, is not sufficient to find a person guilty of aiding and abetting."

### F. Right to Confront an Opposing Witness.

When Sprenz took the witness stand to testify at trial, the clerk asked him to state his name and address. Although Sprenz stated his name, the prosecutor stated to the court that he hoped it would not be necessary to require Sprenz to state his current address. The court then instructed counsel to proceed. Upon asking Sprenz how he was employed, Mezzapella's counsel stated that the clerk had asked Sprenz to state his address. The prosecutor then repeated his request, and the court again instructed him to proceed. No objection to Sprenz's failure to state his current address was made at that time, nor at any other time during trial. The appellants now claim that Sprenz's failure to state his current address denied them their Sixth Amendment right to confront opposing witnesses. We disagree.

As Sprenz testified under his real name, there was no mystery as to his identity. Second, defense counsel never objected to the prosecution's request that Sprenz's current address not be revealed. Had the defendants needed Sprenz's current address, they should have explained their reasons "so that the judge could weigh these requirements against danger to the witness." *United States v. Bennett,* 409 F.2d 888, 901 (2d Cir.1969). They showed no need for this information. Although given the opportunity to examine Sprenz before trial, the defense chose not to do so. Defense counsel also chose not to go into this area when cross-examining Sprenz at trial[6]

**6.** At one point during cross-examination of Sprenz, the prosecution objected to questions

that appeared to inquire about Sprenz's current residence. M. Hatcher Norris, Dyman's coun-

and at a post-trial hearing, and during direct examination of Agent Zabowsky at trial and at a post-trial hearing.

Appellants' reliance on *Smith v. Illinois*, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968), is misplaced. There, the Sureme Court held that the trial court's refusal to allow a defendant to ask the principal prosecution witness his real name and where he lived, even though the witness admitted that the name he first gave was false, denied the defendant his Sixth Amendment rights. The Court explained that "[t]he witness' name and address open countless avenues of in-court examination and out-of-court investigation." 390 U.S. at 131, 88 S.Ct. at 749. Here, it is clear that the defendants were not prejudiced by their failure to learn Sprenz's address. The only lost "avenues of investigation" they point to are information from Sprenz's neighbors concerning his employment at the time of the burglary, and whether he possessed weapons in his home. These avenues were hardly lost, since the defense knew Sprenz's home address as of the day of the burglary. Indeed, Mezzapella, Spainhower and Valentino were at his home the day of the burglary, and Mezzapella and Valentino had been there before.

### G. The District Court's Questions of Agent Farley.

 On direct examination, Agent Farley testified that, from a distance of twenty yards and equipped with night vision glasses, he saw Dyman and another person (later identified as Sprenz) enter the rear window of the bank on the night of the burglary. Farley stated that his vantage point from a nearby shed offered a clear view, that he had seen Dyman several times before, and that he was positive that Dyman was one of the individuals who entered the bank.

After defense counsel cross-examined Farley, Judge Clarie asked Farley whether he had seen Dyman before the night of the burglary, and then asked "So when you

sel, was conducting the cross-examination, and responded that, as to Sprenz's current residence,

saw him on October 16, there was no question as to who he was?" Defense counsel immediately moved for a mistrial, arguing that the court's questioning improperly prejudiced the jury. Judge Clarie denied the motion, but in his charge to the jury specifically instructed it not to infer anything from the fact that he occasionally asked questions of a witness.

The district court asked two questions of a witness during a long trial. The information elicited had already been stated, and the evidence against Dyman was overwhelming. This limited questioning was "entirely appropriate." *United States v. Berardelli*, 565 F.2d 24, 30 (2d Cir.1977); Fed.R.Evid. 614(b).

### H. Admission of Evidence Seized from Dyman.

 When an F.B.I. agent identified himself to Dyman in front of his apartment house, Dyman denied his identity, and tried to discard two ohmmeters and a book on linear circuitry in his possession. Dyman now claims that the district court should not have admitted into evidence the two ohmmeters and the book, as these items were not relevant to his involvement in the scheme. We disagree.

Sprenz testified that the burglary plans called for him and Dyman to neutralize the alarm system, and Dyman was identified as having entered the bank with Sprenz on the night of the burglary. Sprenz also testified that he and Dyman stole a van a week before the burglary, starting it by "hot wiring." Given that the items were related to Dyman's knowledge of electronics, which was the aspect of the burglary scheme in which he assisted, we conclude they were clearly relevant.

The convictions of the appellants are affirmed.

"I'm a million miles away from that. I have no desire to know."