### UNITED STATES of America

v.

### Kelvin DURHAM, Marcus Davis, Jabari Albert, and Keith Hawkins, Defendants.

### Civil Action File No. 1:14–cr–00395–TCB–ECS.

United States District Court, N.D. Georgia, Atlanta Division.

Signed April 30, 2015.

Stephanie Elaine Gabay–Smith, Office of United States Attorney, Atlanta, GA, for United States of America.

Kelvin Durham, Lovejoy, GA, pro se.

Regina Cannon Stephenson, Federal Defender Program, Atlanta, GA, for Defendants.

## ORDER

TIMOTHY C. BATTEN, SR., District Judge.

This case comes before the Court on Magistrate Judge E. Clayton Scofield's Report and Recommendation (the "R & R") [108], which recommends that Defendants' motions to dismiss and requests for a hearing [85, 88, 89, 92] be denied. Defendants Kelvin Durham, Marcus Davis, and Jabari Albert have filed objections to the R & R [111, 112, 113].[1]

■ A district judge has a duty to conduct a "careful and complete" review of a magistrate judge's R & R. *Williams v.*

*Wainwright*, 681 F.2d 732, 732 (11th Cir. 1982) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 408 (5th Cir.1982)).[2] This review may take different forms, however, depending on whether there are objections to the R & R. The district judge must "make a de novo determination of those portions of the [R & R] to which objection is made." 28 U.S.C. § 636(b)(1)(C). In contrast, those portions of the R & R to which no objection is made need only be reviewed for clear error. *Macort v. Prem, Inc.*, 208 Fed.Appx. 781, 784 (11th Cir.2006).[3]

■ "Parties filing objections must specifically identify those findings objected to. Frivolous, conclusive or general objections need not be considered by the district court." *Nettles*, 677 F.2d at 410 n. 8. "This rule facilitates the opportunity for district judges to spend more time on matters actually contested and produces a result compatible with the purposes of the Magistrates Act." *Id.* at 410.

■ The district judge also has discretion to decline to consider arguments that were not raised before the magistrate judge. *Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir.2009). Indeed, a contrary rule "would effectively nullify the magistrate judge's consideration of the matter and would not help to relieve the

---

1. Defendant Hawkins has filed no objections to the R & R.

2. The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981, as well as all decisions issued after that date by the Unit B panel of the former Fifth Circuit. *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir.1982); *see also United States v. Schultz*, 565 F.3d 1353, 1361 n. 4 (11th Cir.2009) (discussing the continuing validity of *Nettles* ).

3. *Macort* dealt only with the standard of review to be applied to a magistrate's factual findings, but the Supreme Court has held that there is no reason for the district court to

apply a different standard to a magistrate's legal conclusions. *Thomas v. Arn*, 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). Thus, district courts in this circuit have routinely applied a clear-error standard to both. *See Tauber v. Barnhart*, 438 F.Supp.2d 1366, 1373–74 (N.D.Ga.2006) (collecting cases). This is to be contrasted with the standard of review on appeal, which distinguishes between the two. *See Monroe v. Thigpen*, 932 F.2d 1437, 1440 (11th Cir.1991) (when a magistrate's findings of fact are adopted by the district court without objection, they are reviewed on appeal under a plain-error standard, but questions of law remain subject to de novo review).

workload of the district court." *Id.* (quoting *United States v. Howell,* 231 F.3d 615, 622 (9th Cir.2000)).

After conducting a complete and careful review of the R & R, the district judge may accept, reject or modify the magistrate judge's findings and recommendations. 28 U.S.C. § 636(b)(1)(C); *Williams,* 681 F.2d at 732. The district judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1)(C).

Defendants' motions to dismiss assert that the conduct of law enforcement in this action was so outrageous that it violated due process guarantees and dismissal of the indictment is warranted.[4] Specifically, Defendants allege that the Government's confidential informant ("CI") initiated contact with Durham, that an undercover agent exerted pressure on. Durham to follow through with a planned robbery, and that the conspiracy was, in effect, manufactured by the Government. Judge Scofield concluded that Defendants have failed to show that the Government's conduct was so outrageous, rare, shocking and unconscionable as to demand dismissal, and he recommends denial of their motions. The Court has conducted a careful, de novo review of the R & R and Defendants' objections thereto. Having done so, the Court finds that Judge Scofield's factual and legal conclusions were correct and that Defendants' objections have no merit.

## I. Factual Contentions and Objections

The objections filed by Defendants Durham, Davis, and Albert mirror each other in all material respects. For that reason, unless specifically noted below, the Court's analysis applies equally to each of their respective objections.

Defendants effectively raise two objections to the R & R. First, they challenge the magistrate judge's conclusion that the Government's conduct did not deprive Defendants of due process. And second, they argue that a hearing is necessary to resolve factual disputes regarding the underlying criminal complaint. These objections simply resurrect the arguments already advanced in support of Defendants' motions to dismiss and will be addressed in turn. But first, a brief recitation of the underlying story, as told by the undercover agent and by Defendant Durham.

ATF[5] Special Agent A. McLeod's affidavit, which forms the basis of the criminal complaint, states that Durham contacted the Government's CI in June 2014, saying he was actively looking for "a good lick" (a robbery) to hit and needed some "big dope." Later that month, the CI contacted Durham and suggested that he knew of a drug stash house with approximately ten kilograms of cocaine that could be robbed. Durham expressed interest and set up a meeting with the CI's contact (undercover agent Task Force Officer A. Edmondson), but Durham failed to show for the meeting and nothing came of the CI's offer—until nearly three months later. In September 2014, Durham reached out to the CI and asked to meet about the drug stash house. Durham told the CI that the reason he had not been in touch since the summer was that he and his crew had been "on a lick"

---

4. Courts recognize that government involvement in a crime may in theory become so outrageous and excessive that it violates due process and requires dismissal of charges against a defendant. *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). To establish such a due process violation, the government's conduct must be so

outrageous as to offend common notions of fairness and shock the universal sense of Justice. The burden is heavy—the Eleventh Circuit has never found the defense availing and has never reversed a case on such grounds.

5. Bureau of Alcohol, Tobacco, Firearms and Explosives.

in Alabama. Back in Georgia and ready to carry out another robbery, Durham asked to be put in touch with the CI's contact about the stash house. At that point, the CI put Durham back in touch with the Government's undercover agent. At an in-person meeting the next day, the undercover agent explained to Durham that he knew of a stash house where there would be at least ten kilograms of cocaine. And he told Durham that there were typically three to four armed Mexican individuals at the house. Durham asked about the location of the stash house, but the undercover agent explained that he would not know until the day of, that his contact would text him the location just before he was to make a pick-up. The undercover agent explained that Durham would be responsible for scripting how the robbery would take place, but he did want to meet Durham's associates before the robbery, to make sure they were all familiar with him so that he would not get hurt. Durham agreed.

A few days later, on September 29, Durham and the CI spoke again. Durham stated that he and his "people" were ready to conduct the robbery. A few texts were later exchanged between Durham and the undercover agent, and they planned a second meeting. On October 1, Durham, this time with Albert, met with the undercover agent and the CI to discuss the details of the planned robbery. The undercover agent again explained that there were typically four Mexicans at the stash house, one of which carried a "chopper" and the others had handguns. They discussed the way in which they would enter the house, planning to surprise the Mexicans by entering the house through the front door after the undercover agent entered. Durham indicated that he had a "four man team." Again, the undercover agent made clear that he wanted to meet the whole team in advance of the robbery, so that Durham and his associates would be famil-

iar with him and could avoid hitting him during the home invasion.

Two weeks later, on October 14, Durham contacted the undercover agent to ask when the robbery would take place. The undercover agent set a meeting with Durham and his team for October 16. But on October 16, Durham texted that he had a "family emergency" and could not meet. The undercover agent explained that the following day was to be the day of the robbery and he wanted to meet with Durham and the entire team before that in order to get acquainted. Durham explained that he and his team had gotten "vests" and were ready to go. They met the following day. Durham arrived with three other individuals; Albert, Davis, and Hawkins. All four Defendants got into the undercover agent's car and began discussing the plan for carrying out the robbery. The undercover agent then explained that he needed to pick up a special Corvette with a hidden "trap" (a concealment compartment to hide drugs). Defendants asked when they were going to hit the stash house, and the undercover agent responded, "Now." The four Defendants traveled with the undercover agent to pick up the Corvette, and indicated that they were ready to go to the stash house to carry out the plan. Upon arriving at the storage facility where the Corvette was kept, the undercover agent got into the Corvette and when he opened the trunk to show the four Defendants the hidden compartment, Durham, Hawkins and Davis pulled their guns on him and Durham said, "Don't move." The ATF special response team emerged from hiding in the storage unit and arrested the Defendants.

Defendants raise a few specific disputes to this factual recitation. They contend that it was the CI who first approached Durham in June 2014 about illegal activity, and that it was the CI who re-initiated

contact with Durham in September 2014. Likewise, Defendants argue that it was the Government, through the CI and the undercover agent, who introduced the idea of a robbery, exerted pressure on Durham to follow through, and persuaded him that he would need to recruit a team with weapons to carry out the robbery. But these factual disputes, even if true on every score, describe activity that falls far short of the outrageous and shocking conduct necessary to establish a due process violation.

## II. Outrageous Government Conduct Standard

■ Due process bars a conviction where "the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Russell*, 411 U.S. at 431–32, 93 S.Ct. at 1643. Conduct may be deemed outrageous if "the government instigates the criminal activity, provides the entire means for its execution, and runs the entire operation with only meager assistance from the defendant." *United States v. Puett*, 735 F.2d 1331, 1335 (11th Cir.1984).

■ Defendants do not contend that the Government detailed the planned robbery, that it provided Defendants with firearms, that it forced or directed Durham to recruit a team of three accomplices, that it provided the "know-how" to conduct a home invasion, or that it ran the entire operation with only meager assistance

from Durham. As explained in detail below, Defendants have not set forth alleged conduct on the part of the Government that could possibly sustain their claim of outrageous Government action. Such an attack on an indictment may only be invoked in the "rarest and most outrageous circumstances." *United States v. Tobias*, 662 F.2d 381 (5th Cir.1981).[6] Those circumstances are not present in this case. Indeed, the Eleventh Circuit has expressly declined to apply the outrageous conduct defense to substantially similar conduct. *See United States v. Sanchez*, 138 F.3d 1410 (11th Cir.1998). Comparing the facts of this case to *Sanchez*, the magistrate judge found them to be "virtually indistinguishable." Defendants resist this comparison.

The charges in *Sanchez* grew out of a "reverse sting" operation where the defendants agreed to invade and steal drugs from a house they were told contained illegal drugs.[7] In fact, there was no house and there were no drugs. A brief review of the facts in *Sanchez* reveals that the factual scenario is undeniably similar. In *Sanchez*, the Eleventh Circuit provided the following general summary of the facts:

[The ATF] received information from a confidential informant about a group of armed home invaders who would "rip-off" narcotics from stash houses. Working with an informant and recording some of the conversations, the government created a reverse sting operation by which the defendants agreed to all

---

**6.** Neither the Supreme Court nor the Eleventh Circuit has ever found a violation of due process based on the government's outrageous conduct. *United States v. Jayyousi*, 657 F.3d 1085, 1111 (11th Cir.2011). Courts have consistently declined to find outrageous conduct in cases involving far more elaborate schemes and significantly more government involvement than what Defendants allege here.

**7.** Similar challenges to "reverse sting" operations have been rejected by the Eleventh Circuit on numerous occasions. *See Sanchez*, 138 F.3d at 1413; *United States v. Savage*, 701 F.2d 867, 869–70 (11th Cir.1983); *United States v. Gianni*, 678 F.2d 956 (11th Cir. 1982); *United States v. Nicoll*, 664 F.2d 1308, 1314–15 (5th Cir. Unit B 1982), *cert. denied*, 457 U.S. 1118, 102 S.Ct. 2929, 73 L.Ed.2d 1330 (1982), *rev'd on other grounds, United States v. Henry*, 749 F.2d 203 (5th Cir.1984).

the details of a home invasion. They were arrested in a parking lot where they had assembled in readiness for going to the stash house to steal the drugs, which they had been told would involve 50 kilograms of cocaine and 300 pounds of marijuana ... ATF agents contacted individuals suspected of being involved in home invasions. Informed by these individuals that large amounts of narcotics could be stolen in a home invasion, defendants voluntarily agreed to participate.

*Sanchez*, 138 F.3d at 1412–14. Defendants argue that here, the idea of a stash house robbery was wholly instigated by the Government, unlike the situation in *Sanchez*. But the Court fails to see the difference urged by Defendants. Similar to Durham, defendant Sanchez argued on appeal that he was "minding his own business [and] was solicited to participate in a [government-manufactured new crime]." His co-defendants likewise argued that the government developed a plan to use an informant and an undercover agent to develop a fictitious stash house scenario and that their involvement was only based upon the government's provocation and tempting. "Absent [ ] coaching from the federal agents, these individuals would never have found their way into [f]ederal [c]ourt." The Eleventh Circuit was unpersuaded that the Government's invitation to participate in a crime rose to the level of misconduct, and this Court is equally unpersuaded. As in *Sanchez*, Durham's availability for the crime, his recruitment of a team of three accomplices, and the provision of a robbery plan and firearms was the result of Defendants' activity, not the Government's.

In a further attempt to distinguish *Sanchez*, Defendants argue that the defendants in *Sanchez* comprised a pre-existing criminal team, while Durham was a lone operator. But Defendants do not challenge the assertion that Durham was indeed the leader of a crew (a "four man team") that conducted robberies, that he spent several years in state prison for multiple robbery convictions, and that Durham stated he had been on another "lick" in Alabama over the summer. Nor do they challenge the fact that Durham and Albert met with the undercover agent on October 1 to discuss the nature of the stash house, demographics of the neighborhood, whether the drug suppliers had other watch houses in the area, the type of doors the houses had, how long the undercover agent would be inside, and the age of the Mexican cartel members, and most importantly that Defendants, not the undercover agent, would be responsible for scripting the robbery. When the undercover agent inquired about his "crew," Durham responded "Everybody I done rocked with, I done rocked with before, we go in on them folks boy." [1] at 8.

Defendants' objections, therefore, boil down to the assertion that the Government lured Durham into involving himself in a purported robbery and created a scenario under which he would have to bring weapons by repeatedly telling him that the stash house would be guarded by armed men. Again, such allegations falls far short of the outrageous and shocking government conduct required to establish a due process violation demanding dismissal.

In *Owen v. Wainwright*, 806 F.2d 1519, 1522 (11th Cir.1986), the defendants argued that a government informant obtained their participation in illegal activity "through persistent lucrative offers" made by a confidential informant. Despite the defendants' initial refusals to become involved in a criminal scheme, their involvement was due to an informant's initiation and insistence. The court rejected the notion that such allegations established a due process violation. "[W]hile the informant suggested the criminal activity to the

defendants and continued to advise them on completing the transaction, the defendants themselves took a significant role in obtaining the necessary supplies." *Wainwright*, 806 F.2d at 1522 (citing *United States v. Mulherin*, 710 F.2d 731, 736 (11th Cir.1983)); *see also United States v. Simpson*, 2010 WL 1611483, at *13 (D.Ariz. Apr. 20, 2010) ("[G]overnment 'luring' does not itself create an outrageous government conduct defense.").[8]

### III. Evidentiary Hearing

■ Finally, Defendants argue that they are entitled to an evidentiary hearing on the disputed facts outlined above. But Defendants have not alleged facts that, even if true, would entitle them to dismissal of the indictment. Thus, an evidentiary hearing would be of little value. *See United States v. Holloway*, 778 F.2d 653, 658 (11th Cir.1985) ("[T]he prevalent rule as to the showing required to entitle a defendant to a hearing on a charge of prosecutorial misconduct is that if defendants raise a material fact which, if resolved in accordance with the defendants' contentions, would entitle them to relief, they would be entitled to a hearing.") (internal quotation marks omitted); *United States v. Dyman*, 739 F.2d 762, 768–69 (2d Cir.1984) (holding that it was not error for trial court to decline to conduct full evidentiary hearing

before trial on outrageous government conduct claim). There being no allegation of the sort of extreme circumstances of outrageous government conduct needed to constitute a due process violation, the Court agrees with Judge Scofield that a hearing is not warranted and Defendants' motions are due to be denied.

### IV. Conclusion

The Court adopts as its order the Report and Recommendation [108] and denies Defendants' motions to dismiss [85, 88, 89, 92].[9]

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

E. CLAYTON SCOFIELD III, United States Magistrate Judge.

### I.

### *Introduction and Contentions*

This case is before the Court on four motions to dismiss filed by Defendants Durham, Davis, Albert, and Hawkins, [Docs. 85, 88, 89, 92]. The government responded to the motions, [Doc. 98], and Defendants filed replies, [Docs. 101, 103, 104, 105], the last of which was filed on February 13, 2015. The motions are now

---

8. *Simpson* is an instructive case from the District of Arizona presenting a factually similar reverse sting operation. An undercover agent in *Simpson* arranged for a confidential informant to make contact with individuals who might be interested in a violent robbery. The informant arranged a meeting between the undercover agent and one of the defendants. The undercover agent devised a story about a fictitious stash house, told the defendant that the robbery would have to occur in daylight because he would not know the location of the drugs until he received a call, and he explained that the stash house was guarded by armed men. These details were specifically designed to ensure that the hypothetical

robbery would involve potential violence so that only capable, undeterred, and "hard core" home invaders would be caught in the plan. The defendants then came up with a plan, recruited a number of individuals to assist, and were later arrested with firearms on the day of the planned robbery. The court rejected the defendants', motion to dismiss based on outrageous government conduct.

9. The Court also denies [110], styled as "Motion to Dismiss Indictment," but which in fact contains Defendant Albert's objections to the R & R, and appears to have been re-filed as [111].

ready for a report and recommendation to the district judge.

The motions to dismiss the indictment assert that the conduct of law enforcement in this investigation was so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction. [Docs. 85 at 5; 88 at 5; 89 at 5–6; 92 at 5]. To support this argument of a due process violation Defendants submit that the government confidential informant ("CI") initiated the contact with Defendant Durham and introduced the idea of a robbery to him; that the CI and undercover agent ("UC") exerted pressure on Mr. Durham to go through with the robbery and "enticed" Mr. Durham to recruit team members for the job; and that the CI and the UC developed the idea that weapons would be needed for the job and motivated the Defendants to agree to the job by telling them that ten kilograms of cocaine would be available for the taking. [Docs. 85 at 5; 88 at 5; 89 at 6; 92 at 6].

The government proffers a different interpretation of the story line, derived from the affidavit filed in support of the criminal complaint. *See* [Doc. 1].[1] The government submits that Mr. Durham contacted the CI looking to acquire firearms in April of 2014 and that in June 2014 Durham told the CI that he was actively looking for "a good lick," meaning an opportunity for a robbery. [Doc. 1 at 3]. The CI reported that Durham was known for robbery and had served time in prison for armed robbery. *Id.* Mr. Durham's convictions were confirmed. *Id.* Later in June, the CI apparently contacted Mr. Durham suggesting that he knew of a stash house with ten kilograms of cocaine that could be robbed. *Id.* Mr. Durham expressed interest, and a

meeting was set up for July 2 that Mr. Durham did not show up for. *Id.*

In early September, nearly three months after his no-show, Durham contacted the CI and asked to meet. A meeting occurred on September 23, 2014, among the CI, Durham and the UC. *Id.* at 4. The meeting took place in the UC's car outside a restaurant. *Id.* The parties discussed the possibility of making a "move," meaning a home invasion robbery to obtain cocaine. *Id.* The UC advised Mr. Durham that he knew of a location where cocaine would be. *Id.* Mr. Durham told the UC he was ready to commit. *Id.* The UC advised Mr. Durham that he routinely picked up five kilograms of cocaine at the location and that he could guarantee a minimum of ten would be there to be taken. *Id.* at 4–5. He also told Mr. Durham that the stash house would be guarded by three to four armed Mexicans. *Id.* at 4.

Further details regarding the plan for the robbery were discussed at this meeting, including the need for the UC to meet the members of Defendant's team that would handle the robbery, so he could make sure he (the UC) would not be shot during the hold-up. *Id.* at 5. Mr. Durham was told the area of Atlanta where the alleged Mexican drug source operated. *Id.* When he left the vehicle, Mr. Durham showed the CI and UC a handgun that he had concealed in his pocket. *Id.* at 5–6. This meeting on September 23, 2014, was apparently videotaped and audio-taped. [Doc. 98 at 4].

On September 29, 2014, Mr. Durham contacted the CI, and Mr. Durham said he and his people were ready to do the job. [Doc. 1 at 6]. Between September 29 and 30, the UC and Mr. Durham exchanged text messages and agreed to meet on Octo-

---

**1.** The references to [Doc. 1] will be to the pages of the affidavit sworn to and attached to the criminal complaint.

ber 1. *Id.* On that date, Mr. Durham, accompanied by Defendant Albert, met with the UC and CI. *Id.* at 6–7. They discussed the proposed robbery at length, in particular the manner in which entry would be made. *Id.* The UC again advised Mr. Durham and Mr. Albert that they could guarantee that ten kilograms would be available for taking at the stash house when the robbery occurred. *Id.* at 7. The UC also wanted to meet the entire team, again, purportedly because he did not want to get accidentally shot during the robbery. *Id.* The UC stated that there was no pressure on the Defendants to commit and that if there was any hesitation on their part, they would not proceed. *Id.* at 7–8. Mr. Durham and Mr. Albert asked many questions about the details of the job. *Id.* at 8. Both acknowledged that there was no hesitation on their part. Durham at one point stated that "Everybody I done rocked with, I done rocked with before, we go in on them folks, boy." *Id.* It is unclear from the affidavit whether this meeting was also video and audio taped, although the specific quotes would suggest that it was.

On October 17, 2014, Durham texted the UC to confirm that they would meet and then do the job. *Id.* at 9. They met at a Krystal in Decatur. *Id.* This meeting was also video and audio-taped. [Doc. 98 at 10–11]. All four Defendants showed up. All four got in the UC vehicle. [Doc. 1 at 9]. Defendants discussed how they would do the job—"hit the door." *Id.* The UC was advised to stand to the side out of the way in case of shots fired. *Id.* The UC then said he had to go pick up a Corvette equipped with a trap compartment built in to hold the drugs, which the Defendants could use, before they did the job. *Id.* at 9–10. When asked when they would hit the house, the UC replied "Now," and invited the Defendants to follow him to pick up the Corvette. *Id.* at 10. All proceeded to a storage unit in Tucker. *Id.*

The Corvette was parked outside a unit at the storage facility. *Id.* The UC got in, started it, and opened the trunk to show Defendants the trap compartment. *Id.* At that point, Mr. Durham pulled a pistol and pointed it at the UC, telling him not to move. *Id.* Defendant Hawkins pulled a handgun, as did Davis. *Id.* At this point an ATF response team deployed "flash bangs" and came out of the storage unit. *Id.* at 11. All the Defendants were arrested on the scene and several firearms were seized. *Id.*

## II.

### Legal Standards

Defendants claim that the government engaged in such outrageous conduct as to violate their rights to due process of law under the Constitution, requiring dismissal. The issue presented is whether Defendants have sufficiently set forth conduct that would sustain their claim and whether they are entitled to an evidentiary hearing on their motions. My recommendation is that the motions be denied without an evidentiary hearing.

In *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the Supreme Court recognized outrageous governmental conduct as a legal defense. To succeed under this defense, the defendant must show that the challenged governmental conduct violated "that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." *Russell,* 411 U.S. at 432, 93 S.Ct. at 1643 (quoting *Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 246, 80 S.Ct. 297, 304, 4 L.Ed.2d 268 (1960)); *see also Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); *United States v. Tobias,* 662 F.2d 381 (5th Cir.1981), *cert. denied,* 457 U.S.

1108, 102 S.Ct. 2908, 73 L.Ed.2d. 1317 (1982).[2] Whether outrageous governmental conduct exists "turns upon the totality of the circumstances with no single factor controlling," and the defense "can only be invoked in the rarest and most outrageous circumstances." *Tobias,* 662 F.2d at 387; *see also United States v. Michael,* 17 F.3d 1383, 1386 (11th Cir.1994) ("Dismissal is only favored in the most egregious cases.").

Neither the Supreme Court nor the Fifth nor Eleventh Circuits has ever reversed a case on the ground of outrageous government conduct. *United States v. Sayers,* 698 F.2d 1128, 1130 (11th Cir. 1983); *United States v. Gianni,* 678 F.2d 956, 959–60 (11th Cir.), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982). Recently, in *United States v. Jayyousi,* 657 F.3d 1085, 1111 (11th Cir. 2011), the Eleventh Circuit noted that:

> We have never applied the outrageous government conduct defense and have discussed it only in dicta. *See United States v. Ciszkowski,* 492 F.3d 1264, 1272 (11th Cir.2007) (Carnes, J., concurring) (describing the outrageous government conduct doctrine as rooted in "speculative dicta" and noting that we have never "reversed a conviction or vacated a sentence on th[is] basis"). Several of our sister circuits have either rejected this defense completely, *see United States v. Boyd,* 55 F.3d 239, 241 (7th Cir.1995), or have been sharply critical of the defense, *see, e.g., United States v. Tucker,* 28 F.3d 1420, 1422–27 (6th Cir.1994) (citing separation of powers concerns and discussing the lack of authority for any argument that outrageous government conduct violates due process); *United States v. Santana,* 6 F.3d 1, 3 (1st Cir.1993) ("Outrageous

misconduct is the deathbed child of objective entrapment, a doctrine long since discarded in the federal courts.").

Nevertheless, after further stating that it had "never acknowledged the existence of the outrageous government conduct doctrine," the Court in *Jayyousi* observed that "outrageous government conduct occurs when law enforcement obtains a conviction for conduct beyond the defendant's predisposition by employing methods that fail to comport with due process guarantees." 657 F.3d at 1111–12 (citing *Ciszkowski,* 492 F.3d at 1270).

### III.

### *The Law Applied*

In this case, the undersigned concludes that the conduct alleged by the Defendants does not rise to a level of "fundamental [un]fairness, shocking to the universal sense of justice, mandated by the Due Process Clause of the Fifth Amendment." *Russell,* 411 U.S. at 432, 93 S.Ct. at 1643. The government has proffered facts under oath through the affidavit presented with the complaint which establish probable cause for the charges ultimately returned in the superceding indictment, namely assault upon an officer of the United States while engaged in his official duties in violation of 18 U.S.C. § 111(a) and (b), as well as conspiracy to possess cocaine in violation of 21 U.S.C. §§ 846 and 841. *See* [Doc. 61].

Even taking the statements in the affidavit in their light most favorable to the Defendants, the government's conduct did not deprive Defendants of due process guarantees. The totality of the circumstances does not show that the government instigated the criminal activity in this case

---

**2.** Decisions of the Fifth Circuit handed down before Oct. 1, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. City of Prich-* *ard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc). *Tobias* was decided on November 30, 1981, and is therefore not binding authority.

or introduced the idea of the crime to Mr. Durham. The affidavit attests that the CI came to the government because Mr. Durham had told him he was looking for "a good lick" to hit and needed some "big dope." Mr. Durham had a record of robbery convictions. This was before the CI told Mr. Durham in June that he knew of a possible target for a robbery and Mr. Durham indicated an interest. Nothing was pursued initially, and Mr. Durham was seemingly uninterested in following up. It was not until September, nearly three months later, that Defendant Durham recontacted the CI to pursue the robbery idea. Defendant had nearly three months of no contact with the CI to walk away without pursuing the matter. But he came back.

Furthermore, the subsequent history does not show an operation in which the government was so pervasively over-involved as to challenge fundamental fairness. The facts in the affidavit show that Mr. Durham was an active, motivated participant. He was not "directed" to recruit a team—a team was organically necessary for the crime he agreed to participate in. The government did not entice him to obtain weapons for the home invasion, nor did they actually procure any tools for the robbery, except arguably the Corvette with the trap compartment the UC was going to let the Defendants use for the robbery. Weapons would obviously be required for a successful rip-off of a Mexican drug stash house. What weapons were needed was left up to the Defendants.

The government also did not introduce the idea of this robbery to the other Defendants—Mr. Durham did that by recruiting them. And, when Mr. Albert, for example, came to the meetings to discuss carrying out this violent plan, he was fully involved. Likewise, all four of the Defendants met together on the day of the proposed robbery with the CI and the UC as full partners in this endeavor—their assistance and role was not to be meager at all—they were the ones taking on the role of the lead participants in a rip off that would likely result in death or injury to the Mexican drug dealers they were robbing. Indeed, their advice to the government UC was to stay out of harm's way when the "hit" went down, so he wouldn't get shot. If there was "know-how" provided here regarding this home invasion robbery plan, it was not coming from the government; it was from the Defendants.

Exactly what was going on when the Defendants pulled their weapons on the UC is still unclear. They may have "made" the UC and suspected the government's involvement. They may have decided to rob the UC, thinking he had drug proceeds for the purchase of the five kilograms of cocaine.[3] Maybe they wanted the Corvette. But whatever involvement the CI and the UC had in the development of the robbery scenario, that scenario did not involve the Defendants pulling their weapons on the UC at the storage unit. The government certainly did not initiate that plan.

Although the facts, taken in their best light for Defendants, show that the government dangled the opportunity to rip off some drug dealers in front of Mr. Durham and followed up with him when he took the bait, that conduct was not outrageous. "[G]overnment infiltration of criminal activity is a recognized and permissible means of investigation ..., even though the government agent supplies something of value to the criminal." *Tobias,* 662 F.2d at 386 (citations and internal quotation marks omitted). In particular, "[w]here the government is investigating offenses

---

**3.** Five kilograms of cocaine would have a wholesale value of close to $100, 000, based on the values per kilo the Court is familiar with from many other cases.

involving illegal drugs, it often must engage in undercover operations because it is very difficult to discover the contraband. This activity by the government does not generally constitute outrageous conduct." *United States v. Lopez–Cruz,* 170 Fed. Appx. 634, 636 (11th Cir.2006) (unpublished decision). "Moreover, challenges to the 'reverse sting' method of police investigation have been rejected by this Court on numerous occasions." *United States v. Sanchez,* 138 F.3d 1410, 1413 (11th Cir. 1998).

*Sanchez,* indeed, is informative. In that case, the scenario was very similar to the case at bar. The ATF received information from a confidential informant about a group of armed home invaders who would rip off stash houses. *Id.* at 1412. Working with the informant, the government created a reverse sting operation by which the defendants agreed to the details of a home invasion. *Id.* They were arrested in a parking lot where they had assembled in readiness for going to the stash house, which they had been told would involve 50 kilograms of cocaine and 300 pounds of marijuana. *Id.* After discussing the outrageous government conduct defense, the Court found that the government's conduct "[did] not approach that demonstrable level of outrageousness the case law suggests would be necessary for reversal of the defendants' convictions." *Id.* at 1414. The same result should obtain in this case, which is virtually indistinguishable.

"Where the government merely presents a defendant with a routine criminal opportunity of which the defendant is more than willing to take advantage, the government's actions do not amount to outrageous conduct warranting dismissal." *United States v. Rolon,* 445 Fed.Appx. 314, 322 (11th Cir.2011) (unpublished decision). In this case, the government presented Mr. Durham and the other Defendants with a "routine" criminal opportunity that

they appeared to have been more than willing to take advantage of.

Insofar as an evidentiary hearing is concerned, such a hearing would be inappropriate. "[W]ithout sufficient factual allegations to support an outrageous-governmental-conduct defense, the Court need not hold an evidentiary hearing on the issue." *United States v. Galvis–Pena,* No. 1:09–CR–25–TCB–CCH–4, 2012 WL 425240, at *5 (N.D.Ga.) (Batten, J.) (citing *United States v. Holloway,* 778 F.2d 653, 658 (11th Cir.1985)). Moreover, Defendants' contentions about the agents' conduct in this case "raise questions that are intermeshed with questions going to the merits of the case because they would require proof of the criminal conduct alleged in the indictment," and therefore, "they are not capable of resolution without a ['trial on the merits'] under Fed. R.Crim.P. 12(b) [ (1) ]." *Id.* at *5. Rule 12(b)(1) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine *without a trial on the merits.*" Fed. R.Crim.P. 12(b)(1) (emphasis added).

## IV.

### *Conclusion*

Accordingly, for the reasons discussed above, the undersigned **RECOMMENDS** that the motions to dismiss, [Docs. 85, 88, 89, 92], be **DENIED** and that the requests for an evidentiary hearing be likewise **DENIED.**

**SO REPORTED AND RECOMMENDED,** this 17th day of March, 2015.